**In re PRIMEDIA, INC. SHAREHOLDERS LITIGATION.**

**C.A. No. 6511–VCL.**

Court of Chancery of Delaware.

Submitted: Feb. 22, 2013.

Decided: May 10, 2013.

Jessica Zeldin, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; James S. Notis, Jennifer Sarnelli, Gardy & Notis, LLP, Englewood Cliffs, New Jersey; Judith L. Spanier, Abbey Spanier, LLP, New York, New York; Harold B. Obstfeld, Harold B. Obstfeld, P.C., New York, New York; Attorneys for Plaintiffs.

A. Thompson Bayliss, Abrams & Bayliss LLP, Wilmington, Delaware; Meredith E. Kotler, Boaz S. Morag, Cleary Gottlieb Steen & Hamilton LLP, New York, New York; Attorneys for Defendants Primedia, Inc., Charles J. Stubbs, TPG Capital, L.P., Pittsburgh Holdings, LLC, and Pittsburgh Acquisition, Inc.

Martin S. Lessner, Danielle Gibbs, Emily V. Burton, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Adam Offenhartz, Gabrielle Levin, Gibson, Dunn & Crutcher LLP, New York, New York; Attorneys for Defendants Beverly C. Chell, David A. Bell, Meyer Feldberg, H. John Greeniaus, Daniel T. Ciporin, and Kevin J. Smith.

R. Judson Scaggs, Susan Wood Waesco, Morris, Nichols, Arsht & Tunnell, LLP, Wilmington, Delaware; Lewis R. Clayton, Andrew G. Gordon, Paul, Weiss Rifkind, Wharton & Garrison LLP, New York, New York; Attorneys for Defendants Kohlberg Kravis & Roberts & Co. L.P., KKR Associates, LP, KKR 1996 GP LLC, Perry Golkin, Thomas Uger, and Dean B. Nelson.

**OPINION**

LASTER, Vice Chancellor.

On May 15, 2011, the board of directors of Primedia, Inc. ("Primedia" or the "Company") adopted a resolution approving a merger agreement among the Company, TPG Capital, L.P. ("TPG"), and TPG's wholly owned acquisition subsidiaries (the "Merger Agreement"). Later that day, Primedia's majority stockholder, Kohlberg Kravis Roberts & Co. L.P. ("KKR"), approved the Merger Agreement by written consent. When the transaction closed on July 13, 2011, each share of Primedia common stock, including those held by KKR, was converted into the right to receive $7.10 in cash (the "Merger").

At the time, Linda Kahn and a co-plaintiff were litigating a derivative action on Primedia's behalf (the "Derivative Action"). They alleged that KKR traded on inside information when it purchased shares of Primedia's preferred stock in 2002, and they sought disgorgement of KKR's profits under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del.Ch.1949).

In this action (the "Class Action"), Kahn and her co-plaintiff allege that the terms of the Merger were unfair because the Primedia directors failed to obtain any value for the *Brophy* claim. They argue that the Merger conferred a special benefit on KKR, because KKR knew it was highly unlikely that any acquirer would pursue the *Brophy* claim. Consequently, they say, the Merger must be reviewed for entire fairness. They also challenge a provision in the Merger Agreement that limited the Primedia board's ability to change its recommendation that stockholders vote in favor of the Merger.

The defendants have moved to dismiss the complaint for failure to state a claim on which relief can be granted. As to the entire fairness claim, the motion is denied. Under *Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243 (Del.1999), and *In re Massey Energy Co.*, 2011 WL 2176479

(Del.Ch. May 31, 2011), the plaintiffs have standing to pursue the claim, and they have pled a reasonably conceivable theory. Otherwise, the motion is granted.

## I. FACTUAL BACKGROUND

The facts are drawn from the Consolidated Amended Class Action Complaint (the "Class Complaint" or "CC") and the documents it incorporates by reference, including the Company's filings with the Securities and Exchange Commission and the Third Amended and Consolidated Derivative Complaint (the "Derivative Complaint" or "DC"), which was the operative complaint at the time of the Merger. I have taken judicial notice of docketed items from the Derivative Action, including a motion to dismiss filed by a Special Litigation Committee formed by the Primedia board (the "SLC") and the SLC's February 19, 2008 report (the "SLC Report"). At this stage of the case, the Class Complaint's allegations are assumed to be true, and the plaintiffs receive the benefit of all reasonable inferences.

### A. Primedia, KKR, And The Preferred Stock

In the early 1990s, KKR backed defendant Beverly C. Chell and two other individuals in founding Primedia. Until the Merger, KKR was always Primedia's controlling stockholder. At the time of the Merger, two KKR affiliates—KKR Associates, LP and KKR GP 1996 LLC—served as the general partners for investment funds that owned approximately 58% of Primedia's outstanding common stock. For simplicity, I refer only to KKR. Consistent with its status as Primedia's controlling stockholder, KKR always maintained a significant presence on the Primedia board, although the identity of KKR's representatives changed over time.

During the latter half of the 1990s, Primedia raised capital by issuing multiple series of preferred stock. Three series are pertinent to this case: the Series D Preferred, the Series F Preferred, and the Series H Preferred (collectively, the "Preferred Stock"). The terms of each series contemplated a period during which Primedia would have the option to redeem at a premium, followed by a date on which Primedia was obligated to redeem at a predetermined value. Each series paid annual cash dividends that accrued and were payable in arrears. Each series fixed the annual dividend at a specific amount or as a percentage of the liquidation preference. At the mandatory redemption date, the holders would receive the contractually required redemption payment plus all accumulated and unpaid dividends.

On August 21, 1996, Primedia issued two million shares of Series D Preferred, which carried a liquidation preference of $100 per share and paid annual cash dividends equal to 10% of the liquidation preference. The optional redemption period began on February 1, 2001, but Primedia was obligated to pay an early redemption premium if the stock was redeemed prior to 2006. The mandatory redemption date was February 1, 2008.

On January 16, 1998, Primedia issued 1.25 million shares of Series F Preferred, which carried a liquidation preference of $100 per share and paid annual cash dividends of $9.20 per share. The optional redemption period began on November 1, 2002, but Primedia was obligated to pay an early redemption premium if the stock was redeemed in 2002 or 2003. The mandatory redemption date was November 1, 2009.

On June 10, 1998, Primedia issued 2.5 million shares of Series H Preferred, which carried a liquidation preference of $100 per share and paid annual cash divi-

dends of $8.625 per share. The optional redemption period began on April 1, 2003, but Primedia was obligated to pay an early redemption premium in 2003, 2004, or 2005. The mandatory redemption date was April 1, 2010.

The shares of Preferred Stock were registered under the Securities Act of 1933 and publicly traded. The annual dividends and mandatory redemption date gave the Preferred Stock an investment profile resembling a bond. As long as Primedia had sufficient funds legally available to make the mandatory redemption payment, the returns on the Preferred Stock could be calculated and then adjusted for the possibilities of non-payment or early redemption.

## B. The Preferred Stock Exchange Program

In April 2000, Primedia's stock closed at a high of $29.25. But Primedia's value rested largely on its portfolio of internet-related media assets, and with the bursting of the technology bubble, Primedia's shares declined steadily. They reached the low twenties in May 2000, the low teens by February 2001, and the high single digits by September 2001. In March 2002, the stock traded between $2 and $4 per share. By July 2002, it had dipped below $1. The Preferred Stock fell too and traded at a steep discount to face value. The Series D Preferred, for example, had a face value of $100 per share plus accrued and unpaid dividends but traded in the $20 to $30 range. *See* DC ¶¶ 20–21.

During a board meeting on September 21, 2001, Primedia management gave a presentation entitled "Exchange of Preferred for Common." DC ¶ 24. Management anticipated that by issuing shares of common stock in exchange for up to $100 million of Preferred Stock, Primedia could save up to $9 million per year in dividends.

On December 19, 2001, the board authorized Primedia to use shares of common stock to repurchase up to $100 million of Preferred Stock at 50–60% of its face value (the "Exchange Program"). Because the issuance of additional shares of common stock would dilute the existing common holders, the board decided that Primedia would not engage in exchanges at an effective stock price below $5 per share. To derive the effective stock price, Primedia divided the face value of the Preferred Stock by the number of shares of common stock issued in exchange. For example, if Primedia common stock was trading at $2 per share, and if a holder of Preferred Stock exchanged shares with a face value of $1 million for 40 cents on the dollar, then Primedia issued 200,000 shares of common stock in exchange for the Preferred Stock. The effective stock price was derived by dividing the face value of the Preferred Stock ($1,000,000) by the number of common shares issued (200,000), resulting in an effective price of $5 per share.

The first exchanges began in March 2002. On April 8, Primedia issued a press release announcing the Exchange Program. The press release noted that Primedia was authorized to acquire Preferred Stock with a face value of up to $100 million and that Primedia had acquired Preferred Stock with a face value of $62 million as of that point. The lowest effective common stock price in any transaction was $5.16. On April 10, Primedia made a small exchange and continued making exchanges after that date.

On May 16, 2002, the board authorized exchanges for another $100 million in face value of Preferred Stock. Exchanges continued through July 2002.

In total, between March and July 2002, Primedia acquired shares of Series D Pre-

ferred with a face value of $23 million, shares of Series F Preferred with a face value of $22.7 million, and shares of Series H Preferred with a face value of $29.8 million. *See* DC ¶ 28. In exchange, Primedia issued 14.4 million shares of common stock.

## C. KKR Considers Buying Preferred Stock For Itself.

In early 2002, KKR had four representatives on the Primedia board: Henry R. Kravis, George R. Roberts, Perry Golkin, and Joseph Y. Bae. A fifth member of the board, Dean B. Nelson, was the CEO of a consulting company that provided services exclusively to KKR.[1]

On May 21, 2002, five days after the May 16 meeting at which the Primedia board authorized additional purchases of Preferred Stock, Primedia directors Golkin and Bae co-authored a memo for KKR's Investment Committee and Portfolio Committee (the "May 21 Memo"). *See* CC ¶ 35; DC ¶ 29. Its purpose was to update the KKR committees "on Primedia's performance and revisit the topic of KKR purchasing a portion of Primedia's cash-pay preferred stock." CC ¶ 35; DC ¶ 29 (quoting May 21 Memo) (internal quotation marks omitted). Bae and Golkin told the SLC that KKR previously had discussed possible purchases as early as December 2001.

The May 21 Memo contained nonpublic information about Primedia's performance for both the second quarter of 2002 and the year as a whole. For the second quarter, the May 21 Memo reported that Primedia's EBITDA would be well ahead of publicly disclosed guidance and that the higher EBITDA numbers were nearly as-

sured because of the volume of advertising already sold:

### Q2 Estimates

The Company provided 2nd quarter Street guidance for Reported EBITDA of $58–$60 million. The Budget calls for Reported and Cash EBITDA of $66.3 million and $66.1 million, respectively. At this point, most of the second quarter advertising has been sold (with the exception of some weekly publications) and the Company is confident it will meet or exceed Street Guidance.

DC ¶ 31 (quoting May 21 Memo) (internal quotation marks omitted). The May 21 Memo reported that Primedia management projected annual results well above the publicly disclosed figures:

### 2002 Outlook

The Company's Street guidance for 2002 Reported EBITDA remains at $245–$260 million ($235–$250 million on a Cash basis). This compares to the Company's budgeted Reported and Cash EBITDA of $265 million and $255 million, respectively.

In our recent meetings with the business units, we received a re-forecast for the year of Reported and Cash EBITDA of $271 million and $261 million, respectively, based on first quarter actuals and current business trends. While most business units (with the exception of Enthusiast/EMAP and Haas) have experienced softer market conditions than originally anticipated, the Company's re-forecast is slightly above Budget primarily due to (1) identification and implementation of run-rate cost savings of approximately $60 million ($46 million in 2002), (2) a reversal of $4 million of 2001 bonus accruals and (3) a lower estimate

---

1. The Class Complaint and Primedia's public filings conflict over when Nelson joined the Board. Given the procedural posture, the facts are described as alleged in the Class Complaint.

for divested EBITDA, which added $7 million to the new estimates.

*Id.* ¶ 32 (quoting May 21 Memo) (internal quotation marks omitted). The authors of the May 21 Memo concluded that "after our discussions with the business unit heads, we are optimistic that the Company is on track to achieve its targeted cost reductions and deliver its Street guidance of Cash· EBITDA of $235–$250 million. . . ." *Id.*

The authors of the May 21 Memo recommended that KKR purchase shares of Preferred Stock at then-current market prices, before the market became aware of Primedia's improving performance:

### Preferred Stock Purchase

On May 8th, Moody's downgraded the Company's senior debt and preferred stock two notches to B3 and Ca, respectively—one notch below S & P—as a consequence of Primedia not yet delivering on its divestiture goal of $250 million. Both Moody's and S & P have Primedia on negative outlook. Although we do not find the Moody's downgrade to be particularly surprising given Primedia's leverage, we believe the downgrade will put downward pressure on the price of the Company's preferred stock. Two days after the downgrade, the Company swapped $2 million par value of preferred stock at 48% of par value for common stock at $2.52 (the equivalent of Primedia issuing stock at $5.25 per share). To date, the Company has completed $65 million par value of swaps at an average price of 60% of preferred par value for common stock at an average price of $3.19 (the equivalent of Primedia issuing stock at $5.28 per share).

Based on (1) our increased comfort level in the Company achieving Street guidance, (2) our optimism for the Company's future prospects and (3) the impli-

cations of the Moody's downgrade on the preferred stock price, we continue to believe the Company's outstanding cash-pay preferred stock offers an attractive risk-reward investment opportunity for the 1996 Fund. Primedia currently has $510 million of cash-pay preferred stock outstanding (three separate issues paying dividend of 8.625%–10.00%). We believe it may be possible to buy a sizeable position of the preferred for cash between 45%–55% of par value due to heightened investor concerns about the Company's financial performance, leverage and future liquidity. At these levels, these securities are yielding anywhere between 15%–20% cash-on-cash returns depending on the tranche of preferred. Assuming the preferreds ultimately returned 100% face value in 2004/2005 when Primedia is unwound, the gross IRR on this investment would be between 30%–50% (See Attachment B). We think the 1996 Fund should consider buying up to $50 million of the preferred stock.

We continue to believe that our best chances of acquiring a sizeable block of the preferred stock at a low price will probably be in the next few months before any significant future asset divestitures and/or the Company's business performance improves in 2H02/2003.

DC ¶ 33 (quoting May 21 Memo) (internal quotation marks omitted); *see also* CC ¶¶ 37, 39.

One reasonably conceivable interpretation of the May 21 Memo, which the Class Complaint embraces, is that Golkin, Bae, and their co-authors recommended that KKR acquire a "sizeable block of the preferred stock" precisely because they had heard presentations from Primedia management during board meetings, talked with the business units, received the Company's internal forecasts, and knew what

Moody's and the market did not yet know about Primedia's prospects. The May 21 Memo plainly indicates the advantage KKR would gain by using this information: buying the Preferred Stock at "45%–55% of par value due to heightened investor concerns about the Company's financial performance, leverage, and future liquidity." DC ¶ 33; *see also* CC ¶ 37.

Importantly, the authors of the May 21 Memo did not anticipate KKR needing to manufacture an exit from the Preferred Stock position. They simply recognized that KKR could acquire Preferred Stock on the cheap, confident that the Company's contemplated asset sales and positive performance made redemption highly likely.

### D. KKR Enters The Market.

On May 31, 2002, Primedia acquired additional shares of Preferred Stock in exchange for common stock. On June 19, Primedia engaged in two additional exchanges. By the end of June, however, the price of Primedia's common stock had fallen further, closing on June 27 at $1.61 per share. The decline meant that unless Preferred Stock could be exchanged at less than a third of face value, Primedia would have to issue so many shares of common stock that the effective issuance price would drop below the floor of $5 per share. Primedia's final exchange of 2002 took place on June 27.

KKR was not similarly constrained. On July 3, 2002, KKR formed ABRA III LLC ("ABRA") as a vehicle for purchasing the Preferred Stock. Through affiliates, KKR owned 100% of ABRA.

In an effort to mitigate corporate opportunity concerns, KKR approached Primedia about purchasing the Preferred Stock. In its proposal, KKR undertook to defer to Primedia if Primedia wished to acquire Preferred Stock (the "Deferral Agree-

ment"). On July 2, 2002, Chell emailed a form of written consent to directors Meyer Feldberg, H. John Greeniaus, and David Bell, with a fax to Bae. The cover memo stated:

> [I]nvestment partnerships managed by KKR are considering the purchase of outstanding shares of Primedia preferred stock for up to $50 million in cash . . .
>
> You may be aware that there is a doctrine in corporate law call [sic] "usurpation of a corporate opportunity" . . .
>
> The Written Consent states in the first resolution that a cash purchase by Primedia of its outstanding preferred stock would not be in the best interest of Primedia and Primedia waives the opportunity.

DC ¶ 39 (internal quotation marks omitted). The written consent was never executed.

On July 8, 2002, Chell circulated a similar written consent to the full board. The cover memo stated:

> Attached for your consideration is a written consent of the Board of Directors of PRIMEDIA determining that it is not usurping a corporate opportunity for investment partnerships managed by KKR to acquire PRIMEDIA Preferred Stock for cash.

DC ¶ 44 (internal quotation marks omitted). All of the directors executed the written consent, with Feldman's signature page arriving at Primedia on July 12.

ABRA began buying Preferred Stock on July 8, 2002, before the written consent was fully executed. In July, ABRA made thirteen purchases of Preferred Stock, paying a total of $30.5 million for 189,606 shares of Series D Preferred, 216,500 shares of Series F Preferred, and 548,331 shares of Series H Preferred. On July 31, five days after KKR made a large pur-

chase, Primedia announced EBITDA of $65.1 million for the second quarter, exceeding guidance of $58–60 million. Primedia's common stock traded up from $1.00 to $1.30 per share. *See* DC ¶ 53. On August 8, ABRA paid nearly $5 million for an additional 10,750 shares of Series F Preferred and 138,966 shares of Series H Preferred. *See id.* ¶ 54.

### E. The American Baby Sale

On September 26, 2002, the board met to approve selling the assets of Primedia's American Baby Group to a third party for $115 million in cash (the "American Baby Sale"). KKR representatives Golkin, Bae, and Kravis participated in the board meeting, as did Nelson, KKR's consultant. *See* CC ¶ 38; *but see* DC ¶ 55 (stating Roberts, but not Nelson, attended the meeting). Primedia did not announce the sale publicly until November 4.

On September 26, 2002, the same day that the board approved the American Baby Sale, ABRA paid $8.5 million for shares of Preferred Stock with a face value of $22.9 million. On October 7, ABRA paid $30.7 million for Preferred Stock with a face value of $84.9 million. *See* CC ¶ 41; DC ¶ 57.

After the November 4, 2002 public announcement of the American Baby Sale, the trading price of Primedia's common stock rose by 15%. The trading price of the Series D Preferred rose by 38.4%. *See* CC ¶ 40; DC ¶ 56.

On November 5, 2002, a Primedia employee informed Bae that Primedia was resuming its exchanges of common stock for Preferred Stock. Rather than adhering to the Deferral Agreement, KKR purchased 44,000 shares of Series H Preferred for $1.5 million. *See* DC ¶ 58.

In December 2002, with the cash from the American Baby Sale available to fund redemptions, the board authorized the Company to use up to $25 million to buy Preferred Stock. But Primedia could not find willing sellers, in part because KKR had "sucked dry" one of the large holders. SLC Report at 231. During all of 2003, Primedia could only purchase approximately $16 million of Preferred Stock. *See* DC ¶ 60.

In total, through ABRA, KKR acquired 35.8% of the Series D Preferred, 57.9% of the Series F Preferred, and 52.7% of the Series H Preferred. *See* CC ¶ 42; DC ¶ 59. KKR spent $76.4 million for 2,226,197 shares of Preferred Stock with a face value of $222.6 million, paying an average price equal to 32% of face value. KKR's $76 million investment exceeded the $50 million figure referenced in the July 2002 written consent. By contrast, the board authorized Primedia to acquire Preferred Stock with a face value of up to $200 million, yet in the aggregate, Primedia only managed to acquire Preferred Stock with a face value of $75 million.

### F. Primedia Redeems The Preferred Stock.

In February 2005, Primedia sold one of its assets, About.com, for approximately $410 million. By this time, the Preferred Stock traded at nearly 100% of face value, and Goldman Sachs advised the board that Primedia should consider redeeming the Preferred Stock because of its relatively high dividend. On March 9, the board approved a plan to redeem all of the outstanding shares of the Series D Preferred and Series F Preferred. *See* SLC Report at 156. These issuances were the most expensive for Primedia because they paid dividends of 10% and 9.2% respectively. On May 11, pursuant to its certificate of designations, Primedia redeemed the Series F Preferred at par plus all accrued dividends. On the same date, also pursu-

ant to its certificate of designations, Primedia redeemed the Series D Preferred at par plus all accrued dividends, plus the contractual early redemption premium. *See* DC ¶ 76.

In 2005, Primedia sold another of its assets in a transaction that generated approximately $385 million in cash. This time, Goldman Sachs recommended redeeming the Series H Preferred. The board approved the plan, and on October 31, Primedia redeemed the Series H Preferred at par plus accrued dividends and paid the contractual early redemption premium. *See* SLC Report at 171.

As a result of the redemptions, KKR realized total proceeds of $222.6 million, representing a capital gain of approximately $150 million on an approximately $76 million investment. *See* DC ¶ 78; *see also* CC ¶ 43. In addition, KKR received approximately $40 million in dividends during the time when it held the Preferred Stock, raising its total profits to $190 million. *See* CC ¶ 43.

### G. The Filing Of The Derivative Action And The Formation Of The SLC

On November 29, 2005, Kahn filed the first of two derivative complaints on behalf of Primedia. On February 16, 2006, Alan Spiegal filed the second. The actions were consolidated, and the plaintiffs filed an amended complaint in April 2006. The plaintiffs' main theory at the time was that the Primedia directors breached their fiduciary duties by causing Primedia to sell assets and redeem the Preferred Stock prematurely to benefit KKR.

The defendants moved to dismiss the consolidated complaint. In November 2006, Vice Chancellor Lamb denied the motion, holding that the complaint adequately pled that KKR exercised control over Primedia, stood on both sides of the stock redemptions, and received a benefit

from those redemptions not shared with other stockholders. *See In re Primedia Inc. Deriv. Litig.,* 910 A.2d 248, 256–61 (Del.Ch.2006) (the "Dismissal Ruling").

On May 23, 2007, the board formed the SLC. Its two members, Daniel T. Ciporin and Kevin J. Smith, were newly appointed independent directors. The litigation was stayed pending the outcome of the SLC's investigation.

In August 2007, the plaintiffs filed their second amended complaint. The new complaint added a claim that by purchasing Preferred Stock between July 8, 2002 and November 5, 2002, KKR usurped corporate opportunities belonging to Primedia.

The SLC thoroughly investigated the redemption claim and the corporate opportunity claim. The SLC and its counsel reviewed some 140,000 documents, conducted twenty-one interviews, and consulted with three experts. During the course of its work, the SLC and its advisors held twenty-three formal meetings and engaged in numerous informal discussions and consultations.

In September 2007, the plaintiffs were sent a small document production that included the May 21 Memo. In January 2008, after the SLC had completed its factual investigation, the SLC met with plaintiffs' counsel to review the SLC's preliminary conclusions. The SLC advised the plaintiffs that it planned to recommend dismissal of the Derivative Action and did not intend to pursue any claims based on the May 21 Memo. The plaintiffs disagreed with the SLC's conclusions and contended that the May 21 Memo supported a strong *Brophy* claim.

The SLC had not previously evaluated a *Brophy* claim. The SLC's counsel understood that the SLC was charged with acting reasonably to maximize the value of the Derivative Action as a corporate asset,

but counsel believed the SLC only needed to consider those theories that the plaintiffs explicitly alleged in their complaint based on the limited information that the plaintiffs possessed when they filed their pleading. The SLC's counsel had not viewed the SLC's charge as including a duty to evaluate other reasonably apparent and better supported theories that were revealed during the course of the investigation, even if those theories provided a potential means of maximizing the value of the litigation asset. Of course, the concept of maximizing the value of a derivative action does not necessarily mean litigating every possible claim or insisting on settlement value for it. Maximizing the value of a derivative action for the benefit of the corporation could mean seeking to dismiss claims that an independent SLC reasonably believes, in good faith, after conducting a reasonable investigation, would have a negative risk-adjusted present value for the corporation, taking into account the potential benefits and detriments of pursuing those claims.

After being notified about the *Brophy* claim, the SLC held its final meeting. The SLC did not conduct any additional investigation into the *Brophy* claim, but rather analyzed the claim based on the work it had done to investigate the corporate opportunity theory.

On February 28, 2008, the SLC moved to dismiss the Derivative Action. In support of its motion, the SLC filed a 370-page report and eight volumes of appendices. The report dealt thoroughly and decisively with the redemption claim and the corporate opportunity claim. The report also contained fifteen pages analyzing the *Brophy* claim, concluding primarily that the statute of limitations barred it. The SLC also took the view that there was "no evidence that the inside information was material in light of expert analysis regarding its impact on the market price for Primedia's preferred shares, and no evidence that KKR possessed the requisite scienter given contemporaneous memoranda indicating that KKR planned the purchases months before the inside information was issued." Defs.' Op. Br. at 8.

For the next year and a half, the plaintiffs conducted discovery to test the SLC's disinterestedness and independence, the thoroughness of its investigation, and the reasonableness of its conclusions. In November 2009, the plaintiffs filed their brief in opposition to the SLC's motion and sought leave to file a third amended complaint—the Derivative Complaint—that formally asserted the *Brophy* claim. Leave was granted, and the plaintiffs filed the Derivative Complaint on March 16, 2010.

## H. The *Zapata* Hearing

On June 14, 2010, I conducted a hearing on the SLC's motion to dismiss the Derivative Action. *See In re Primedia Deriv. Litig.*, Consol. C.A. No. 1808–VCL (Del. Ch. June 14, 2010) (TRANSCRIPT) [hereinafter *Zapata* Hearing]. Under *Zapata*, a trial court evaluates such a motion under a two-step test. First, the trial court "inquire[s] into the independence and good faith of the committee and the bases supporting its conclusions." *Zapata Corp. v. Maldonado*, 430 A.2d 779, 788 (Del.1981). The SLC has the burden of proving its "independence [and] good faith" and that it conducted "a reasonable investigation." *Id.* If the trial court is satisfied that "the committee was independent and showed reasonable bases for good faith findings and recommendations," the first step is satisfied. *Id.* at 789. At that point, the trial court may proceed "in its discretion, to the next step[,]" under which the trial court "determine[s], applying its own independent business judgment, whether the

motion should be granted." *Id.* "This means, of course, that instances could arise where a committee can establish its independence and sound bases for its good faith decisions and still have the corporation's motion denied." *Id.*

The Delaware Supreme Court created the second step of the *Zapata* test because it saw "sufficient risk in the realities of a situation like the one presented in this case to justify caution beyond adherence to the theory of business judgment." 430 A.2d at 787.

> [W]e must be mindful that directors are passing judgment on fellow directors in the same corporation and fellow directors, in this instance, who designated them to serve both as directors and committee members. The question naturally arises whether a "there but for the grace of God go I" empathy might play a role. And the further question arises whether inquiry as to independence, good faith and reasonable investigation is sufficient safeguard against abuse, perhaps subconscious abuse.

*Id.* In light of these concerns, the second step takes on critical importance:

The second step provides, we believe, the essential key in striking the balance between legitimate corporate claims as expressed in a derivative stockholder suit and a corporation's best interests as expressed by an independent investigating committee. . . . The second step is intended to thwart instances where corporate actions meet the criteria of step one, but the result does not appear to satisfy its spirit, or where corporate actions would simply prematurely terminate a stockholder grievance deserving of further consideration in the corporation's interest.

*Id.* at 789 (footnote omitted). As I understand the decision, the trial court's task in the second step is to determine whether the SLC's recommended result falls within a range of reasonable outcomes that a disinterested and independent decision maker for the corporation, not acting under any compulsion and with the benefit of the information then available, could reasonably accept.[2]

After hearing presentations from counsel, I concluded that the SLC had established that its members were independent, that they had acted in good faith, and that they had conducted a reasonable investiga-

2. *See Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1997 WL 305829, at *13 (Del.Ch. May 30, 1997) ("the second prong of the *Zapata* test requires that this court exercise its own business judgment with respect to the reasonableness of the settlement"); *see also Forsythe v. ESC Fund Mgmt. Co. (U.S.), Inc.*, 2013 WL 458373, at *2 (Del.Ch. Feb. 6, 2013) (discussing range of reasonableness inquiry). *See generally* Kenneth B. Davis, Jr., *Structural Bias, Special Litigation Committees, and the Vagaries of Director Independence*, 90 Iowa L.Rev. 1305, 1360 (2005) ("the court's review, as contemplated [by *Zapata* ], is of the reasonableness of the SLC's business judgment rather than the substitution of its own."); Gregory V. Varallo et al., *From Kahn to Carlton: Recent Developments in Special Committee Practice*, 53 Bus. Law. 397, 421 (1998) ("Delaware courts, even when exercising their indepen-

dent business judgment, are not likely to act as 'super directors' who override reasonable SLC decisions; rather, they are more likely to limit themselves to an analysis of the reasonableness of the SLC's decision."); E. Norman Veasey, *Seeking a Safe Harbor from Judicial Scrutiny of Directors' Business Decisions–An Analytical Framework for Litigation Strategy and Counseling Directors*, 37 Bus. Law. 1247, 1268 (1982) (interpreting *Zapata* to require the trial court to "decide whether or not the committee acted reasonably in terminating" and thereby adopting "a half-step requiring the court of chancery to invoke its independent discretion to analyze the reasonableness of the business judgment reached by the independent board committee (as opposed to superimposing its own business judgment)." (internal quotation marks omitted)).

tion into the redemption claim and the corporate opportunity claim. *Zapata* Hearing Tr. at 69–71. I found that the SLC's decision not to conduct an additional factual investigation into the *Brophy* claim was reasonable, because the claim arose from the same factual predicate as the corporate opportunity claim. Having investigated the corporate opportunity claim thoroughly, the SLC possessed an adequate factual record on which to assess the *Brophy* claim. *See id.* at 71–72. I also found that the evidentiary implications of the contents of the May 21 Memo and the timing of the purchases before the public announcement of the American Baby Sale were sufficiently powerful that it did not require extensive investigation to conclude that a litigable claim existed. *See id.* at 72–73.

I approved the SLC's recommendations to dismiss the redemption and corporate opportunity claims, finding that they were fully supported by the record and fell within a range of reasonableness. As to the redemption claim, the SLC's investigation established that (i) the asset sales were part of a consistent multi-year business plan to deleverage Primedia's balance sheet, (ii) Primedia sold the assets to third parties on arm's length terms, (iii) the board consistently sought to use the sale proceeds to eliminate the most expensive elements of the Company's capital structure, (iv) Primedia redeemed the Preferred Stock in accordance with the contractual terms in the certificate of designations, (v) the board followed a fair process when making the redemptions, (vi) if evaluated independently of the contract terms, the redemption prices were fair, and (vii) all of Primedia's stockholders benefitted proportionately from the redemptions. Indeed, by the time of the *Zapata* Hearing, the plaintiffs appeared to have abandoned any challenge to the redemptions. *See Zapata* Hearing Tr. at 70–71.

As to the corporate opportunity claim, the SLC recognized that the purchases of the Preferred Stock were a corporate opportunity and that a conflict of interest existed between KKR and Primedia with respect to the purchases. Nevertheless, the SLC's investigation established that (i) until the American Baby Sale, Primedia did not have the capacity to redeem shares of Preferred Stock for cash, (ii) the board and management appropriately limited Primedia's exchanges to transactions with an effective issuance price of not less than $5, and (iii) when KKR was in the market acquiring Preferred Stock, Primedia's stock price had dropped so far that Primedia could not engage in exchanges because of the $5 floor. Primedia therefore did not have the capacity to take advantage of the opportunity, leaving KKR free to exploit it. The SLC's decision not to pursue the corporate opportunity claims therefore fell within a range of reasonableness. *See Zapata* Hearing Tr. at 69–75. The lone exception to the incapacity analysis was KKR's purchase on November 5, 2002, when KKR acquired 44,000 shares of Series H Preferred for $1.5 million. For this purchase, the record indicated that Primedia wanted to reenter the market, Primedia communicated its desire to KKR, and that KKR failed to respond and then bought Preferred Stock for its own account. Nevertheless, in my view, the SLC's decision not to pursue relief for this one purchase did not render its recommendation unreasonable, because the costs, burdens, and distractions of pursuing the litigation easily could outstrip the value to Primedia from the limited potential recovery of the profits on that purchase. *See id.* at 78.

The *Brophy* claim, however, presented difficulties. To succeed on a *Brophy*

claim, a plaintiff must show that: "1) the corporate fiduciary possessed material nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Oracle Corp. Deriv. Litig.*, 867 A.2d 904, 934 (Del.Ch.2004), *aff'd*, 872 A.2d 960 (Del. 2005). If read in a plaintiff-friendly fashion, the May 21 Memo appeared to be a proverbial smoking gun document. It was co-authored by KKR representatives who were directors of Primedia and who received confidential information about Primedia in a fiduciary capacity. It discussed explicitly that Primedia's EBITDA for the second quarter of 2002 would be well ahead of publicly disclosed guidance and that the higher figures were nearly assured because "[a]t this point, most of the second quarter advertising has been sold (with the exception of some weekly publications) and the Company is confident it will meet or exceed Street Guidance." DC ¶ 31 (quoting May 21 Memo); *see also* CC ¶ 36. It then discussed internal information for the year and reported that Primedia management would "achieve its targeted cost reductions and deliver its Street guidance of Cash EBITDA of $235–$250 million. . . ." DC ¶ 32.

The May 21 Memo recognized that the public markets did not have similar information. It noted that nearly two weeks earlier, Moody's had "downgraded the Company's senior debt and preferred stock two notches to B3 and Ca, respectively—one notch below S & P—as a consequence of Primedia not yet delivering on its divestiture goal of $250 million" and that "[b]oth Moody's and S & P have Primedia on negative outlook." DC ¶ 33 (quoting May 21 Memo). The authors of the May 21 Memo then recommended that KKR purchase shares of Preferred Stock at then-current market prices, before the

market became aware of Primedia's improving performance:

> Based on (1) our increased comfort level in the Company achieving Street guidance, (2) our optimism for the Company's future prospects and (3) the implications of the Moody's downgrade on the preferred stock price, we continue to believe the Company's outstanding cash-pay preferred stock offers an attractive risk-reward investment opportunity for the 1996 Fund. Primedia currently has $510 million of cash-pay preferred stock outstanding (three separate issues paying dividend of 8.625%–10.00%). We believe it may be possible to buy a sizeable position of the preferred for cash between 45%–55% of par value due to heightened investor concerns about the Company's financial performance, leverage and future liquidity. . . .

> We continue to believe that our best chances of acquiring a sizeable block of the preferred stock at a low price will probably be in the next few months before any significant future asset divestitures and/or the Company's business performance improves in 2H02/2003.

*Id.* (quoting May 21 Memo) (internal quotation marks omitted); *see also* CC ¶ 37.

The trading that took place after the approval of the American Baby Sale and before the public announcement of the transaction presented a similarly strong case. The May 21 Memo recommended that KKR make its purchases "before any significant future asset divestitures," such as the American Baby Sale. CC ¶ 37; DC ¶ 33 (quoting May 21 Memo). The board approved the sale on September 26, 2002, and three KKR representatives and a KKR consultant participated as directors. Primedia did not publicly announce the transaction until November 4. Between board approval and the public announce-

ment, KKR acquired shares of Preferred Stock with a face value of $107.7 million, paying $39.2 million. After the public announcement of the American Baby Sale, Primedia's common stock traded up 15%, and the Series D Preferred traded up 38.4%.

I determined at the *Zapata* Hearing that a complaint alleging the *Brophy* claim would "blow by" a motion to dismiss. *Zapata* Hearing Tr. at 76. In the eventual appeal, the Delaware Supreme Court expressed uncertainty about this phrase and stated

> we are unable to determine whether the Vice Chancellor's comment, "I start from the proposition that there is a *Brophy* claim here that would blow by a motion to dismiss on failure to state a claim," implicitly suggests he thought the information was sufficiently material but dismissed the claim because of his reliance on *Pfeiffer*. Absent a more focused analysis in the record, we must therefore reverse and remand.

*Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 842 (Del.2011) (footnotes omitted).

My language marked a regrettable lapse into practitioner colloquialism. Defendants often ask their lawyer whether a complaint will "get past" or "get by" a motion to dismiss. When the complaint is quite strong, the practitioner might respond metaphorically that the complaint not only will get past a motion to dismiss, but likely will do so via a judicial decision issued quickly and without much hesitation. In one of our culture's many sports analogies, such a complaint could be said to "blow by" a motion to dismiss. Envision a batsman like the literary Casey. He stands at the plate, representing the defendants. He faces a pitcher, the plaintiff. The pitcher throws his best pitch, the complaint. The batter swings

the motion to dismiss bat, hoping to drive the pitch out of the judicial park. But so strong is the complaint that it blows by the motion to dismiss like a 100+ mile per hour fastball. For those whose preferences run to sports with goalies, the metaphor translates easily.

In this admittedly elliptical language, I rejected the SLC's argument that there was "no evidence" to support a *Brophy* claim, finding instead that there was powerful evidence to support such a claim in the form of the May 21 Memo, the timing of the KKR trades, and the market's reaction to disclosure of the information. *See Zapata* Hearing Tr. at 72–73. The information that KKR possessed appeared material, and KKR appeared to have acted with *scienter*. The *Brophy* claim therefore presented "a viable claim" that likely would have required a trial to resolve. *Id.* at 76.

Given that Primedia possessed a valuable asset in the form of a litigable *Brophy* claim, the question under *Zapata* was whether it fell within a range of reasonableness for the SLC to give up that asset for no consideration. Generally speaking, an unaffiliated third party that possesses a litigable claim will seek to extract something in exchange. Armed with leverage, a third party will use its leverage. *See Zapata* Hearing Tr. at 33 ("[O]ne of the things that I think about arms' length negotiators doing is 'have leverage, use leverage.'"). The reasonableness of the SLC's decision *not* to attempt to extract anything for the litigable *Brophy* claim turned on what Primedia likely could obtain for the claim and at what cost, with the costs and benefits measured not only in dollars incurred or recovered but also by factors such as the distraction of litigation for management, its consequences for employee and executive morale, whether there would be adverse reactions from cus-

tomers, suppliers, and capital providers, and the effectiveness of any internal corrective measures or sanctions. *See generally* 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations and Business Organizations* § 13.17, at 13–81 to 13–83 (2013 Supp.) (listing these and other factors).

At the time of the *Zapata* Hearing, Court of Chancery decisions conflicted on the continuing viability of *Brophy* and the extent of the recoverable damages. *Brophy* itself was a Chancery decision and thus was subject to further Chancery development. Two members of this Court had questioned the continuing vitality of *Brophy,* noted that the case was decided before the establishment of current remedies for insider trading under the federal securities laws, and expressed concern about duplicative recoveries and potential interference with the federal regime. *See Oracle,* 867 A.2d at 927–29; *Goldman v. Isaacs,* 2001 WL 1671439, at *1 (Del.Ch. Dec. 17, 2001). Other Chancery decisions sought to avoid these problems by limiting *Brophy* to situations in which the corporation itself suffered harm. *See Latesco, L.P. v. Wayport, Inc.,* 2009 WL 2246793, at *6 (Del.Ch. July 24, 2009); *In re Am. Int'l Gp., Inc.,* 965 A.2d 763, 800 (Del.Ch.2009); *Guttman v. Huang,* 823 A.2d 492, 505 (Del. Ch.2003). In *Pfeiffer v. Toll,* 989 A.2d 683 (Del.Ch.2010), when the defendants asked me to reject *Brophy* outright, I took the latter course. *See id.* at 698–701.

In assessing what the SLC potentially could recover on the *Brophy* claim, I relied on *Pfeiffer* and assumed Primedia would not be able to obtain full disgorgement of KKR's profits. To the extent Primedia did not have the ability to acquire Preferred Stock at the time KKR was purchasing, as the SLC reasonably concluded for all of the purchases except for the November 2002 transaction, Prime-

dia was not harmed by those transactions. Primedia's disgorgement recovery therefore appeared limited to profits from the November 2002 purchase, which the SLC's counsel projected might be in the $1.5 to $2 million range. *See Zapata* Hearing Tr. at 25, 77–78. The Delaware Supreme Court's decision in *Thorpe v. CERBCO, Inc.,* 676 A.2d 436 (Del.1996), suggested that KKR also might be held liable for the costs that Primedia was forced to incur because of the breach of the duty of loyalty, such as the costs of the SLC investigation and litigation expenses to defend the stockholder action. *Id.* at 445. The SLC's counsel represented that its investigation cost less than $1.5 million. *See Zapata* Hearing Tr. at 23. In total, I estimated that if the case went to trial, the best outcome would be a "mid seven figures damages recovery," discounted for various defenses and reduced by litigation costs. *See id.* at 59–60, 78–79. In particular, I saw "litigable arguments going both ways on the statute of limitations" and "a very real possibility that any claim gets stopped right at the outset because of [that] defense." *Id.* at 76; *see also id.* at 78 ("You may lose at the gate on a statute of limitations defense").

Because I evaluated the risk-adjusted recovery as "low," it fell within a range of reasonableness for the SLC to recommend dismissing the *Brophy* claim for no consideration, rather than imposing upon Primedia the time, expense, and distraction of litigation. *Zapata* Hearing Tr. at 79. By contrast, if the available remedies included full disgorgement such that the damages could reach $150 million, then the analysis would have been different. *See id.* at 60 ("If it's a $150 million claim, it's pretty obvious."). The SLC's counsel agreed. *See id.* at 65 ("Obviously, if we're going to say the potential damages are 150 million instead of 1.5 million, it has an impact."). But because of my belief about the avail-

able recovery, I granted the SLC's motion to dismiss. Had I understood that full disgorgement was possible, I would have denied the SLC's motion with respect to the *Brophy* claim under the second prong of *Zapata.*

## I. The Appeal And The Sale Process

The order dismissing the Derivative Action was entered on June 16, 2010. On July 15, the plaintiffs appealed to the Delaware Supreme Court. They did not challenge the dismissal of the redemption claim. They rather argued that under *Zapata*'s first prong, I erred in finding that the SLC investigated the *Brophy* claim thoroughly and in good faith, and that under *Zapata*'s second prong, I erred in treating full disgorgement as unavailable.

While the appeal was pending, KKR and the Primedia board began considering strategic alternatives. At the time, the board had ten members. Because this board eventually approved the Merger, I refer to it as the "Merger Board." Three directors were associated with or nominated by KKR. A fourth was Primedia's CEO. Another six were outside directors, but several had past ties to KKR or the Company.

- Golkin was an advisory partner at KKR, a general partner of KKR Associates, and a member of KKR 1996 GP. He had served on the board since 1991.
- Nelson was the CEO and founder of Capstone Consulting LLC, a consulting group that worked exclusively with KKR-controlled companies. Previously he served as President and CEO of Primedia from October 2005 to September 2007. He had served on the board since 2003.
- Thomas Uger was a director of KKR and had been a principal at KKR from June 2005 to December 2006.

He had served on the board since 2005.

- Charles J. Stubbs became the President, Chief Executive Officer, and a director of Primedia in May 2008.
- Chell joined the board in 1992 as one of the Company's founders. She served previously as the Company's Chief Financial Officer and General Counsel.
- Feldberg joined the board in January 1997. Feldberg was Dean of Columbia Business School from 1989 to June 2004. During that time the school benefitted from a relationship with Kravis, who helped raise $10 million to establish a fellowship in Feldberg's name.
- Greeniaus joined the board in 1998. He was President and CEO of Nabisco Foods Group when KKR acquired its corporate parent in what was then one of the largest corporate takeovers. He stayed on after the acquisition.
- Bell joined the board in 2001 and was employed at Pegasus Capital Advisors, LP, a private equity fund manager.
- Smith joined the board in July 2006 and was appointed to the SLC in May 2007. He worked as a consultant to private equity firms and privately held companies.
- Ciporin joined the board in July 2006, and was appointed to the SLC in May 2007.

For convenience, I refer to the latter six as the "Outside Directors." The Outside Directors were not formally empowered to act as a committee, but they retained their own legal counsel (Gibson Dunn & Crutcher LLP) and financial advisor (Lazard Ltd.).

On January 11, 2011, Primedia announced that it was exploring strategic alternatives. Primedia's financial advisor, Moelis & Company, contacted 117 potential strategic and financial acquirers. Forty-six executed non-disclosure agreements and received access to an electronic data room. On February 25, eleven bidders submitted preliminary, non-binding indications of interest. At a March 1 meeting, the Merger Board decided to allow all but the lowest bidder to continue to the next round of the process. Over the following three weeks, Primedia management met with the ten participants.

## J. Oral Argument Before The Delaware Supreme Court

On March 23, 2011, the Delaware Supreme Court sitting *en banc* heard oral argument in the plaintiffs' appeal. The plaintiffs allege that the justices asked questions which suggested that they believed *Brophy* provided for a full disgorgement remedy and would reverse the dismissal of the Derivative Action.

## K. The Sale To TPG

Primedia designed its sale process to wrap up in May 2011. On April 20, Primedia's counsel, Simpson Thacher & Bartlett LLP ("Simpson Thacher"), circulated a draft merger agreement to the participants. Moelis instructed them to return a mark-up by May 6 and to provide final bids on May 9.

Three parties submitted bids: TPG at $5.50 per share, Bidder X at $5.65, and Bidder Y at $4.75. Having submitted the lowest bid and failed to provide other requested documentation, Bidder Y was not allowed to proceed further. Moelis instructed TPG and Bidder X to provide new bids by the next afternoon.

On May 12, 2011, TPG and Bidder X delivered revised bids at $6.55 and $6.30 per share, respectively. On May 13, Bidder X bumped its bid to $7.00 per share. On May 14, Moelis instructed both to submit their best and final offers by 3:15 p.m. on May 15. Later on May 14, TPG offered to acquire Primedia for $7.10 per share with a 100% equity commitment. Shortly before the May 15 deadline, Bidder X informed Moelis that its $7.00 offer remained unchanged.

Later on May 15, 2011, the Outside Directors met for thirty minutes with Lazard and Gibson Dunn to consider "the status of the bids and [their] fiduciary duties." CC ¶ 52. Lazard opined that the $7.10 bid was fair.

The full Merger Board then met. At the meeting, Simpson Thacher, a firm with deep and longstanding ties to KKR, advised the Merger Board about the *Brophy* claim. This was allegedly the first time the Derivative Action was discussed in connection with the Merger. *See* CC ¶ 53. The Merger Board concluded that for the reasons discussed in the SLC Report and in light of this Court's dismissal of the Derivative Action (which remained pending on appeal), "the Derivative Action had limited, if any, value to [Primedia]." CC ¶ 53 (internal quotation marks omitted). The Merger Board resolved to accept TPG's bid, adopt the Merger Agreement, and recommend the Merger to its stockholders. After the Merger Agreement was executed, KKR acted by written consent to provide the necessary stockholder approval. *See id.* ¶ 32.

It is undisputed for purposes of this litigation that the Merger Board worked to obtain the best value reasonably available for Primedia's business. The $7.10 per share cash consideration represented a 39% premium over the closing price of Primedia's common stock on January 11, 2011 ($5.10), the date the Company an-

nounced that it was exploring strategic alternatives, and a 62% premium over the closing price of Primedia's common stock on May 13 ($4.38), the last business day before the Merger Agreement was executed. *See* Defs.' Op. Br. at 11. The Merger valued the Company's equity at $316 million. It is also undisputed for purposes of this litigation that the Merger Board did not view the Derivative Action as having value to Primedia, did not attempt to extract value for the Derivative Action from TPG, and did not otherwise seek to preserve the value of the Derivative Action for Primedia's stockholders.

## L. The Delaware Supreme Court Reverses On *Brophy.*

On June 20, 2011, the Delaware Supreme Court issued an opinion reversing the dismissal of the Derivative Action. *See Kahn*, 23 A.3d at 836–38. In doing so, the senior tribunal made clear that full disgorgement of profits is an available remedy under *Brophy,* regardless of whether the corporation was harmed. Citing *Brophy* itself, the Delaware Supreme Court held that "actual harm to the corporation is not required for a plaintiff to state a claim under *Brophy.*" *Id.* at 837; *see also id.* at 840. In the high court's words, "[a]s the court recognized in *Brophy,* it is inequitable to permit the fiduciary to profit from using confidential corporate information. Even if the corporation did not suffer actual harm, equity requires disgorgement of that profit." *Id.* at 837–38. The Delaware Supreme Court saw "no reasonable public policy ground to restrict the scope of disgorgement remedy in *Brophy* cases—irrespective of arguably parallel remedies grounded in federal securities law." *Id.* at 840. The Delaware Supreme Court remanded the Derivative Action to determine if the broader reading of *Brophy* would alter the balancing under

the second prong of *Zapata.* *Id.* at 842–43.

With full disgorgement available, the potential recovery on the *Brophy* claim ballooned to $190 million, comprising $150 million in capital gains plus $40 million in dividends. From my point of view, this clearly changed the analysis. As I had noted during the original *Zapata* Hearing, it was "pretty obvious," at least to me, that the SLC could not reasonably walk away for nothing from a fairly litigable claim that could result in a recovery of $190 million. *Zapata* Hearing Tr. at 60.

## M. Events After The Delaware Supreme Court Decision

On May 23, 2011, the plaintiffs filed actions challenging the Merger in this Court. Other stockholders filed actions in Fulton County, Georgia and Gwinnett County, Georgia, which were stayed pending resolution of this action. On June 3, Kahn filed an amended complaint and moved for a preliminary injunction seeking additional disclosures beyond those in Primedia's preliminary information statement. On June 7, I denied the motion to expedite and declined to schedule a preliminary injunction hearing because the plaintiffs had an adequate post-merger damages remedy.

On June 24, 2011, the Merger Board issued a press release indicating that the SLC had met to discuss the Delaware Supreme Court's decision. The SLC determined that the decision "did not alter the conclusion ... that it was not in the best interests of the Company to pursue the claims asserted in the derivative action." Primedia, Inc., Current Report (Form 8–K) (June 24, 2011). On July 13, the Merger was consummated.

On July 18, 2011, I consolidated the two class actions and established a leadership structure for the plaintiffs. Meanwhile,

the closing of the Merger had eliminated plaintiffs' standing to pursue the Derivative Action, which the parties dismissed by stipulation on August 8. *See In re Primedia Inc Deriv. Litig.*, C.A. No. 1808–VCL (Del. Ch. Aug. 8, 2011) (ORDER). The plaintiffs filed the currently operative Class Complaint on December 12.

## II. LEGAL ANALYSIS

The defendants have moved to dismiss the Class Complaint pursuant to Rule 12(b)(6) for failure to state a claim on which relief can be granted. In a Delaware state court, the pleading standards under Rule 12(b)(6) "are minimal." *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

> When considering a defendant's motion to dismiss, a trial court should accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.

*Id.* The operative test in a Delaware state court thus is one of "reasonable conceivability." *Id.* at 537. This standard asks whether there is a "possibility" of recovery. *Id.* at 537 n. 13. The test is more lenient than the federal "plausibility" pleading standard, which invites judges to "determin[e] whether a complaint states a plausible claim for relief" and "draw on ... judicial experience and common sense." *Id.* at 537 (internal quotation marks omitted).

## A. The Claim Challenging The Fairness Of The Merger

The Class Complaint asserts that the Merger must be reviewed for entire fairness because it conferred a special benefit on KKR, Primedia's controlling stockholder. Through the Merger, the right to assert the *Brophy* claim passed to TPG. The plaintiffs allege that given KKR's stature in the M & A world, it was highly unlikely that any acquirer would sue KKR for insider trading, and particularly so since the acquirers were not being asked to pay any consideration for the *Brophy* claim. It was even more unlikely that a financial buyer like TPG would sue a fellow private equity firm like KKR. But the failure to obtain value for the *Brophy* claim in turn rendered the Merger unfair to Primedia's minority stockholders, because they only received value for their share of Primedia's operating business and not for their share of the Derivative Action.

■ In *Lewis v. Anderson*, 477 A.2d 1040 (Del.1984), the Delaware Supreme Court held that the right to bring a derivative action passes via merger to the surviving corporation. *See* 8 *Del. C.* § 259(a); *Lewis*, 477 A.2d at 1050 n. 19. Where, as here, the surviving corporation is a wholly owned subsidiary of another entity, the litigation asset of the surviving corporation comes under the control of parent. *See Lambrecht v. O'Neal*, 3 A.3d 277, 288 (Del. 2010); *Hamilton P'rs, L.P. v. Englard*, 11 A.3d 1180, 1205–06 (Del.Ch.2010). Under those circumstances, the merger extinguishes the former derivative plaintiffs' standing to sue. *See Lewis v. Ward*, 852 A.2d 896, 900–901 (Del.2004).

What has been less clear under Delaware law is the extent to which stockholders of the acquired corporation can, under limited circumstances, challenge the fairness of the merger by which their standing

to sue was extinguished. This Court has considered such claims on multiple occasions and in different procedural contexts.[3] Conceptually, these claims "embrace the holding of the Supreme Court's decision in *Parnes v. Bally Entertainment Corp.,* which permits a plaintiff to attack a merger directly if the target board agreed to a materially inadequate, and therefore unfair, price because the price did not reflect the value of certain assets—in this case, the Derivative Claims." *Massey Energy,* 2011 WL 2176479, at \*17 (footnote omitted).

As I understand the framework established by *Parnes,* a plaintiff wishing to assert such a claim must first establish standing to sue. *Compare Parnes,* 722 A.2d at 1244–46 (finding that the plaintiff had standing to assert a direct claim) *with Kramer v. W. Pac. Indus., Inc.,* 546 A.2d 348, 354 (Del.1988) (finding that the plaintiff lacked standing to challenge a merger directly). If standing exists, then the plaintiff must still plead a viable claim. *See Parnes,* 722 A.2d at 1246 ("Although we conclude that the Parnes complaint directly challenges the Bally merger, it does not necessarily follow that the complaint adequately states a claim for relief.").

### 1. Standing To Sue Under *Parnes*

■ A plaintiff claiming standing to challenge a merger directly under *Parnes* because of a board's alleged failure to obtain value for an underlying derivative claim must meet a three part test. First, the plaintiff must plead an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim on which relief could be granted. Second, the value of the derivative claim must be material in the context of the merger. Third, the complaint challenging the merger must support a pleadings-stage inference that the acquirer would not assert the underlying derivative claim and did not provide value for it.

### a. Was The Derivative Action Viable?

■ The first element of the *Parnes* inquiry asks whether the underlying corporate claim has survived a motion to dismiss or otherwise could state a claim on which relief could be granted. *See, e.g., Massey Energy,* 2011 WL 2176479, at \*18–21 (making threshold determination that derivative claim asserting *Caremark* liability had potential merit); *Countrywide,* 2009 WL 846019, at \*8–9 (evaluating strength of underlying federal claim); *Golaine v. Edwards,* 1999 WL 1271882, at \*7–8 (Del.Ch. Dec. 21, 1999) (analyzing merits of claim for diversion of merger consideration). If the underlying derivative action is not viable, then there is no litigation asset to value or maintain, and likewise no value to divert to the controlling stockholder or other derivative action defendants.

Although prior cases have not dilated on this issue, it appears to me that Rule 12(b)(6), rather than Rule 23.1, provides

**3.** *See Massey Energy,* 2011 WL 2176479, at \*2–4 (denying motion for preliminary injunction to block merger that would extinguish derivative standing); *Kohls v. Duthie,* 765 A.2d 1274, 1284–85 (Del.Ch.2000) (same; noting that Court previously denied motion to dismiss the merger challenge); *Merritt v. Colonial Foods, Inc.,* 505 A.2d 757, 763–66 (Del. Ch.1986) (Allen, C.) (granting summary judgment for plaintiffs on claim challenging merger as self-interested transaction designed in part to eliminate risk of derivative action where stockholders did not receive a fair price); *see also Brinckerhoff v. Tex. E. Prods. Pipeline Co., LLC,* 986 A.2d 370, 386–96 (Del. Ch.2010) (assessing strength of derivative claims for which standing was extinguished by merger when evaluating fairness of settlement); *In re Countrywide Corp. S'holders Litig.,* 2009 WL 846019, at \*8 (Del.Ch. Mar. 31, 2009) (same), *aff'd,* 996 A.2d 321 (Del.2010).

the operative standard for judging whether the underlying corporate claim could survive a motion to dismiss. This aspect of the *Parnes* inquiry focuses on whether the corporation possessed a viable claim that the board could have caused the corporation to assert. Rule 23.1 exists for the benefit of the corporation, "not . . . for the benefit of defendants." *Am. Int'l Gp.*, 965 A.2d at 808. Rule 23.1 does not apply if the corporation asserts the claim or has permitted a stockholder to sue on the corporation's behalf. *Id.* at 811. Consistent with this approach, Chancellor Allen granted summary judgment as to liability in favor of a class of plaintiff stockholders when a controlling stockholder used a squeeze out merger to extinguish meritorious derivative claims. *See Merritt*, 505 A.2d at 765–66. To determine whether the claims were "meritorious," Chancellor Allen referenced the standard from *Chrysler Corp. v. Dann*, 223 A.2d 384 (Del.1996), which established the test for whether a derivative claim is sufficiently meritorious to support a settlement. *Merritt*, 505 A.2d at 758 n. 1. In *Chrysler*, the Delaware Supreme Court held that

> [a] claim is meritorious within the meaning of the rule if it can withstand a motion to dismiss on the pleadings if, at the same time, the plaintiff possesses knowledge of provable facts which hold out some reasonable likelihood of ultimate success. It is not necessary that factually there be absolute assurance of ultimate success, but only that there be some reasonable hope.

223 A.2d at 387. This standard has been equated with Rule 12(b)(6). *See In re Cox Commc'ns, Inc. S'holders Litig.*, 879 A.2d 604, 639 (Del.Ch.2005).

During the *Zapata* Hearing, I found that the *Brophy* claim presented "a viable claim" that would "blow by" a motion to dismiss and likely would have required a

trial to resolve. *Zapata* Hearing Tr. at 76. Having considered the matter anew in the context of the current motion, I continue to believe that it is reasonably conceivable that the plaintiffs could develop and prove a set of facts that would support a *Brophy* claim.

As noted, to succeed on a *Brophy* claim, a plaintiff must show that: "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *Oracle*, 867 A.2d at 934. The following allegations support inferences that KKR possessed inside information through its director representatives, understood its materiality, and acted with *scienter* to trade on the information before it became known to the market.

- On December 19, 2001, the board authorized a program through which the Company would exchange common stock for up to $100 million of Preferred Stock, indicating that the board believed the Preferred Stock was undervalued. DC ¶ 26.

- On March 5, 2002, Primedia began using its common stock to acquire Preferred Stock. *Id.* ¶ 28.

- On May 16, 2002, the board authorized exchanges for up to an additional $100 million of Preferred Stock, demonstrating again that the board believed the Preferred Stock was undervalued. *Id.* ¶ 27.

- Eight days after the Primedia board meeting on May 16, 2002, Primedia directors Golkin, Bae, Nelson, and three other KKR insiders submitted the May 21 Memo to KKR's Investment Committee and Portfolio Committee. The purpose of the May 21 Memo was to provide an update "on

Primedia's performance and revisit the topic of KKR purchasing a portion of Primedia's cash-pay preferred stock." *Id.* ¶ 29 (internal quotation marks omitted); *see also* CC ¶ 35.

- The May 21 Memo described Primedia management's internal, upward revisions to second quarter EBITDA estimates that went beyond the guidance Primedia provided to analysts. *See* DC ¶ 32. The May 21 Memo reported that achieving the updated estimates was virtually assured because Primedia had already sold "most of the second quarter advertising" even though there was over a month left until the June 30 close of the quarter. *Id.* ¶ 31; *see also* CC ¶ 36. When Primedia later issued a press release on July 31, 2002, announcing that it achieved EBITDA of $65.1 million for the second quarter, "exceeding original guidance of $58–60 million," Primedia CEO Thomas S. Rogers described the performance as a "dramatic improvement in EBITDA[.]" DC ¶ 53.

- The May 21 Memo described Primedia management's internal assessment that Primedia would exceed its full year EBITDA estimates by 4% and reported on the KKR representatives' discussions with internal Primedia business heads. *See id.*

- The May 21 Memo recommended that KKR purchase $50 million of Preferred Stock "before any significant future asset divestitures and/or the Company's business performance improves" in the latter half of 2002 or early 2003. *Id.* ¶ 33; *see also* CC ¶ 37.

- The authors of the May 21 Memo made their recommendation "[b]ased on (1) our increased comfort level in the Company achieving Street guidance, (2) our optimism for the Company's future prospects, and (3) the implications of the Moody's downgrade on the preferred stock price." DC ¶ 33; *see also* CC ¶ 37. The language of the May 21 Memo indicated that the authors' "increased comfort level" and "optimism" resulted from their internal conversations with Primedia personnel and the information they received about EBITDA for the second quarter and the full year. DC ¶ 33. The reference to the Moody's downgrade and its effect on the "preferred stock price" suggested that the authors recognized that the market did not know what they knew and that KKR should take advantage of that fact. *Id.*

- Within six weeks of the May 21 Memo, KKR began purchasing Preferred Stock. *See id.* ¶ 43; CC ¶ 37.

- On September 26, 2002, the Primedia board approved the sale of American Baby Group for roughly $115 million in cash, one of the asset divestitures that Primedia had been planning and which the May 21 Memo appears to have anticipated. All directors attended the meeting, including KKR representatives Kravis, Golkin, Nelson, and Bae. *See* CC ¶ 38; *but see* DC ¶ 55 (stating Roberts, but not Nelson, attended the meeting).

- After the approval of the American Baby Sale, but before the public announcement of the transaction, KKR purchased $39 million of Preferred Stock. *See* CC ¶ 38; *see also* DC ¶¶ 57–58.

Assuming these allegations are true, as I must at this procedural stage, it does not strike me as inconceivable that KKR breached its duty of loyalty under *Brophy*

by misusing material, nonpublic information belonging to Primedia.

The defendants proffer a number of fact-laden arguments about why the foregoing allegations do not support an inference of *scienter* or materiality. First, they observe that KKR's representatives on the Primedia board appear to have first raised the idea of KKR purchasing Preferred Stock in late 2001, and then made their recommendation again in May 2002. According to the defendants, there is "no evidence that KKR possessed the requisite scienter given contemporaneous memoranda indicating that KKR planned the purchases months before the inside information was issued." Defs.' Op. Br. at 8. I frankly do not follow that reasoning. It is reasonably conceivable to me that thanks to its representatives on the Primedia board, KKR knew in late 2001 that Primedia's business had begun to stabilize and that the Company was working actively on its program of asset divestitures. The market appears not to have known these things, and in particular to have lost confidence in Primedia's divestiture program (leading ultimately to the Moody's downgrade). KKR's representatives readily could have recognized these facts in late 2001, understood that KKR knew information that the market lacked, but decided to forego purchases at that time for any number of reasons. By May 2002, with Primedia's business improving, the risk-return profile for KKR was superior and there appeared to be a limited window in which to act. The May 21 Memo can readily be interpreted as reiterating the basic proposition that KKR had information the market lacked, describing that information in detail, and urging KKR to take advantage of the information before the market learned of the improvement in Primedia's business and its upcoming asset sales. It is undisputed that after receiving the May 21 Memo, KKR made large purchases,

precisely as one would expect if KKR were trying to take advantage of a limited trading window, and that KKR made a significant portion of its purchases after the American Baby Sale was approved but before it was announced publicly. At a later stage of the case, the evidence may support a different interpretation, but at the pleadings stage, it is reasonably conceivable that KKR possessed material information and acted with *scienter.*

Second, the defendants argue that the *Brophy* claim fails because the SLC's expert opined that the information in the May 21 Memo was immaterial, citing the apparent lack of a material impact on the trading price of the Preferred Stock. There does not appear to be any dispute that the American Baby Sale was material.

At a later stage of the case, the opinion of the defendants' expert about the information in the May 21 Memo might prove persuasive. It would not be surprising, however, for the plaintiffs to retain an expert of their own, or to develop evidence in discovery or through cross-examination that undermines the opinion of the defendants' expert. For pleading purposes, the language of the May 21 Memo suggests that its authors thought the information in the memo was material. The updated projections were not based on a business model in which the bulk of revenues came in during the last month, or even on the last day of the quarter, but rather rested on Primedia's success in pre-selling advertising. *Cf. Oracle,* 867 A.2d at 911–921 (granting summary judgment where extensive, post-discovery record demonstrated significant fluctuations in revenues that defeated materiality of mid-quarter management projections). When Primedia disclosed its above-guidance results, its CEO described the performance as a "dramatic improvement in EBITDA[.]" DC ¶ 53 (internal quotation marks omitted). That

Primedia would beat Street guidance by nearly 9% seems material, particularly when markets respond disproportionately if a company misses or exceeds earnings guidance by a penny.[4] At the pleadings stage, it is reasonably conceivable that the information in the May 21 Memo was material.

Third, the defendants argue that KKR could not have had the requisite *scienter* in light of expert analysis demonstrating that for every dollar KKR redistributed from the common to the preferred shareholders, KKR lost more than it gained. This argument is another way of pointing out that KKR owned nearly 60% of the common stock, thus if Primedia overpaid for the Preferred Stock, KKR was funding 60 cents of every dollar. But this argument misses the theory of the *Brophy* claim, which does not challenge the price at which Primedia carried out the redemptions. The certificates of designation obligated Primedia to redeem the Preferred Stock and established the prices at which the redemptions would occur. KKR knew that when the time to redeem arrived, it would be funding its nearly 60% share of the redemptions regardless. The unknown variable was who would own the Preferred Stock and receive the payments, and the question was whether KKR could benefit from being in that position. Because of the information its director-representatives possessed, KKR knew that the market was dramatically undervaluing the Preferred Stock and that KKR could bene-

fit from acquiring the shares before the market understood what KKR knew. Under the *Brophy* theory, KKR used inside information on the purchase, not the sale. The redemption analysis focuses on the wrong point in time for the plaintiffs' claim.

Finally, the defendants argue the *Brophy* claim has no merit because, as the SLC concluded, it was time-barred. I continue to believe that there are "litigable arguments going both ways on the statute of limitations" defense and that there is "a very real possibility that any claim gets stopped right at the outset because of [that] defense." *Zapata* Hearing Tr. at 76. If laches bars the *Brophy* claim, then there is no underlying litigation asset. To date, however, the parties have not briefed the laches defense directly. The defendants have focused on what the SLC believed, and the plaintiffs have argued that the SLC's belief is not controlling. This oblique approach does not provide me with adequate adversarial briefing on the laches issue. Rather than hazarding an opinion on this potentially dispositive defense, I will defer its consideration until a later stage. If the defendants wish, they can present this defense by moving for judgment on the pleadings or for summary judgment.

The *Brophy* claim would survive a motion to dismiss under Rule 12(b)(6). Primedia therefore had a viable corporate asset for purposes of establishing standing

---

4. *See, e.g.,* Michael C. Jensen, *Agency Costs of Overvalued Equity,* 34 Fin. Mgmt. 5, 7 (2005) ("CEOs and CFOs know that the capital markets will punish the entire firm if they miss analysts' forecasts by as much as a penny.... [T]he capital markets reward a firm with a premium for meeting or beating the analysts' expectations during the quarter."); Jon Jordan, *Corporate Issuers Beware: Schering–Plough And Recent SEC Enforcement Actions Signal Vigorous Enforcement of Regulation* FD, 58 U. Miami L.Rev. 751, 781–84 (2004) (describing materiality of earnings guidance and example of SEC enforcement action against Raytheon in 2002 for providing selective information to analysts about performance versus guidance); Gretchen Morgenson, *When Bull Market Myths Unravel,* 28 Nova L.Rev. 223, 225–26 (2004) (describing her experience as a journalist witnessing outsized market reactions when companies achieved or missed Street guidance by a penny).

to assert a direct challenge to the Merger under *Parnes*.

### b. Was The Value Of The *Brophy* Claim Material?

■ The second element of the *Parnes* inquiry asks whether the value of the derivative claim was material in the context of the merger. *See Massey Energy*, 2011 WL 2176479, at *25 (analyzing value of derivative claims to determine whether claims were a material asset).[5] In light of the Delaware Supreme Court's revitalization of *Brophy* to include full disgorgement of profits, the potentially recoverable damages consist of profits on the redemptions of $150 million plus dividends of approximately $40 million. In addition, an award likely would include interest running on these amounts from the dates on which the shares of Preferred Stock were redeemed and the dividends paid. Interest typically is awarded at the legal rate, compounded quarterly.[6] Given the amount of time that has passed, the interest award could be considerable. Even without interest, a potential recovery of this magnitude would be material in the context of the Merger, which provided Primedia's stockholders with total consideration of $316 million.

The amounts remain material if discounted to reflect the minority stockholders' beneficial interest in the litigation recovery. Primedia's minority stockholders owned 42% of its outstanding stock, so their *pro rata* share of the Merger consideration was $133 million. Their *pro rata* share of a $190 million recovery on the *Brophy* claim would be $80 million.

This case contrasts sharply with *Massey Energy*, where the plaintiffs alleged that Massey Energy Company had suffered damages of $900 million to $1.4 billion due to the mining explosion at the Upper Big Branch mine. *See Massey Energy*, 2011 WL 2176479, at *21–22. The plaintiffs contended that this was the value of their *Caremark* claim against the *Massey Energy* directors and officers. But despite agreeing that the plaintiffs could plead a viable *Caremark* claim, Chancellor Strine declined to equate the value of the *Caremark* claim with the negative financial effect on Massey of the Upper Big Branch disaster. Chancellor Strine noted that under the *Caremark* theory asserted in that case, the plaintiffs would have to prove that the defendants knowingly violated the law, a difficult standard under any circumstances, and particularly so when the de-

**5.** There is a strong argument that under *Parnes*, standing would exist if the complaint challenging the merger contained adequate allegations to support a pleadings-stage inference that the merger resulted from an unfair process due at least in part to improper treatment of the derivative claim. *See Parnes*, 722 A.2d at 1245 ("In order to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."). Two Court of Chancery decisions have reached different conclusions on whether *Parnes* always requires unfairness of price, or whether unfairness of process alone can support a direct challenge to a merger. *Compare Golaine*, 1999 WL 1271882, at *5–6 (positing that price unfairness is required) *with In re Ply Gem Indus.*

*S'holders Litig.*, 2001 WL 755133, at *5 (Del. Ch. June 26, 2001) (arguing that under *Parnes*, standing to bring a direct claim exists when either the price or the process was unfair) *and Chaffin v. GNI Gp., Inc.*, 1999 WL 721569, at *7–8 (Del.Ch. Sept. 3, 1999) (same). I need not weigh in on this dispute because the value of the *Brophy* claim is clearly material.

**6.** *See, e.g., Aveta Inc. v. Bengoa*, 2010 WL 3221823, at *3 (Del.Ch. Aug. 13, 2010); *Doft & Co. v. Travelocity.com Inc.*, 2004 WL 1152338, at *12 (Del.Ch. May 20, 2004); *Taylor v. Am. Specialty Retailing Gp., Inc.*, 2003 WL 21753752, at *13 (Del.Ch. July 25, 2003); *Borruso v. Commc'ns Telesystems Int'l*, 753 A.2d 451, 461 (Del.Ch.1999).

fendants were disinterested, outside directors. *Id.* at *22. Even for the CEO, Chancellor Strine saw substantial difficulties in proving that he "knowingly encouraged law-breaking and that his actions proximately caused the Upper Big Branch disaster." *Id.* at *23. The Chancellor observed that proving the claims could have negative ramifications for Massey as an entity:

> [I]t is hardly clear that it is in [Massey's] interest for it to be proved that its directors and officers caused the corporation to engage in pervasive violations of the law. Such proof could expose the entity, and thereby indirectly its stockholders, to severe financial harm in the form of large judgments and fines, potentially including punitive damages awards.

*Id.* The Chancellor also perceived potential collection problems, because proving the claim could compromise the defendants' insurance coverage, and the defendants, although well-heeled, could not likely cover a billion dollar judgment. *See id.* at *27. Positing that the most realistic outcome was a settlement for D & O policy limits of $95 million, the Chancellor observed that such an amount was "not material in the context of an $8.5 billion Merger." *Id.* at *28. For these and other reasons, the Chancellor could not conclude that it was probable "that the Derivative Claims have a value that is material in relation to the value of Massey as an entity." *Id.* at *29.

The prospects for recovery in this case are quite different. It is not difficult to calculate the amount of profits and dividends that KKR received, and that amount (plus interest) provides a straightforward measure of the upper bound for the value of the *Brophy* claim. As a controller that profited directly from the trades, KKR will not be able to invoke Section 102(b)(7). *See* 8 *Del. C.* § 102(b)(7). And given its status as a private equity titan, KKR is likely good for the judgment. Clearly there is risk in the litigation, and to succeed, plaintiffs will have to prove materiality and *scienter.* These challenges, however, are not similar to those that led Chancellor Strine in *Massey Energy* to discount so heavily the value of the derivative claims. If I assume prevailing on the *Brophy* claim was a toss-up, or even a 1–in–5 proposition, the risk-adjusted, pre-interest recoveries for the minority of $40 million and $16 million, respectively, remain material when compared to their $133 million share of the proceeds from the Merger.

### c. Would The Acquirer Assert The Derivative Claim?

The third element of the *Parnes* inquiry asks whether the complaint challenging the merger contains adequate allegations to support pleadings-stage inferences that the acquirer would not assert the underlying derivative claim and did not provide value for it. *See Massey Energy,* 2011 WL 2176479, at *23–24; *Golaine,* 1999 WL 1271882, at *4; *Penn Mart Realty Co. v. Perelman,* 1987 WL 10018, at *2 (Del.Ch. Apr. 15, 1987). Without such allegations and the resulting inferences, the merger consideration logically would incorporate value for the litigation, and the merger would not have harmed the sell-side stockholders.

For purposes of *Parnes,* the litigation assets of the acquired corporation can usefully be divided into two categories: (i) claims against third parties, such as contract claims, tort claims, and similar causes of action belonging to the corporation and (ii) claims for breach of duty against sell-side fiduciaries. There is no reason to think either that the acquirer would not determine disinterestedly whether to assert the corporations' claims against third parties or that the value of such claims

would not be incorporated into the merger price. By contrast, there is ample reason to think that an acquirer would not assert, and therefore would not pay for, at least some claims for breach of fiduciary duty against sell-side fiduciaries. The acquirer may agree contractually not to sue the sell-side fiduciaries for breach of fiduciary duty. *See Golaine,* 1999 WL 1271882, at *4 (noting the acquirer could give up the right to sue "in the merger agreement. . . ."); *Bershad v. Hartz,* 1987 WL 6092, at *3 (Del.Ch. Jan.29, 1987). Or the acquirer may be barred from bringing the claims or causing the corporation to sue by the *Bangor Punta* doctrine. *See Golaine,* 1999 WL 1271882, at *4 n. 16.

Even if the acquirer is not prevented from suing, "[a]cquirers buy businesses, not claims." *Carsanaro v. Bloodhound Techs., Inc.,* 2013 WL 1104901, at *36 (Del. Ch. Mar. 15, 2013). "Merger-related financial analyses focus on the business, not on fiduciary duty litigation." *Id.* Consequently, "[w]hile the courts may indulge the notion that the [derivative] claims still 'survive' . . . they usually die as a matter of fact." *Golaine,* 1999 WL 1271882, at *5; *accord Penn Mart,* 1987 WL 10018, at *2 ("I agree that it is highly unlikely that Pantry Pride, which now controls Revlon, will seek to redress the allegedly excessive severance payments or allegedly excessive fees and therefore these abuses (if they are abuses) are not likely to be addressed."). There are also good reasons to believe that the stock markets do not accurately price derivative claims. *See* John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic Theory for Private Enforcement of Law Through Class and Derivative Actions,* 86 Colum. L.Rev. 669, 727 n. 9 (1986) (identifying reasons why the value of derivative actions would not be incorporated in a stock's trading price).

The Class Complaint alleges, and the defendants effectively concede, that the Merger Board did not attribute meaningful value to the *Brophy* claim. *See* CC ¶¶ 3–4, 34. The only discussion about the *Brophy* claim came just before the Merger Board approved the Merger and involved all of the KKR representatives. During the discussion, a law firm with longstanding ties to KKR provided the only advice the Merger Board received about the claim. *See Massey Energy,* 2011 WL 2176479, at *15 ("it would have been better for the [Massey] Board to have received clearer advice [about the Derivative Claims] from a more independent source [than litigation counsel]"). It does not seem likely that TPG or any other party anticipated bringing suit against KKR. They rather bid for Primedia's operating business, planning to treat the Derivative Action "as done" and then "move forward." *Id.* at *26 n. 173. It is therefore reasonably conceivable that none of the bids, including TPG's, attributed any value to the *Brophy* claim. Indeed, if KKR thought that TPG or any other acquirer actually could and would assert the *Brophy* claim, then KKR made an uncharacteristic financial blunder: Before the Merger, KKR faced potential liability on the *Brophy* claim but would benefit proportionately from its share of any recovery; after the Merger, KKR only would have the liability. Would KKR have sold before the Derivative Action was finally resolved if KKR thought the acquirer would sue?

On the question of the acquirer's willingness to assert claims, this case contrasts sharply with *Massey Energy.* There, the acquirer potentially had an incentive to assert the derivative claims to offset third party losses:

> Alpha [the acquirer] has to deal with all of the Disaster Fall–Out and Massey's unique approach to dealing with regu-

lators. This will almost certainly require Alpha to pay settlements, fines, and remediation costs. To the extent that the direct actions against Massey result in findings that Massey, as a corporation, consciously violated the law, Alpha has a rational incentive to shift as much of that liability to the former Massey directors and officers as can efficiently and realistically be achieved. If Alpha does so, it would not be in the position of seeking any windfall, given that it assumed the risks that came with buying Massey and was simply using one tool belonging to Massey to reduce the harm to it.

2011 WL 2176479, at *24. For purposes of the acquirer's willingness to sue and merger pricing, a derivative claim where the acquirer will face related liabilities resembles a cause of action against a third party.

The same is not true for the *Brophy* claim. TPG and Primedia are not exposed to third party claims relating to KKR's dealings in the Preferred Stock, and TPG therefore does not have an incentive to shift a portion of the liability to KKR. Unlike the claims in *Massey Energy*, which were "not a freestanding asset because they [were] bound up with ongoing responsibilities the acquiror, Alpha, is buying with Massey," the *Brophy* claim is "a pure asset." *Id.* at *30 n. 204. As the Chancellor observed in *Massey Energy*,

[i]f an acquiror gets a bargain basement price for an asset in part because of former fiduciary wrongdoing and can enjoy use of the asset *without* bearing any material costs going forward as a result of that prior wrongdoing, the acquiror is unlikely to pursue those claims and it may be equitable to allow the selling stockholders to receive the claims.

*Id.* at *30 n. 199; *see Bokat v. Getty Oil Co.*, 262 A.2d 246, 249 (Del.1970) ("If a proposed merger is sought to be used for the coverup of wrongful acts of management, a Court of Equity in an action making a direct attack on the merger can and will protect the innocent stockholder victim.").

Taking all of these factors together, it is reasonably conceivable that no potential acquirer, including TPG, incorporated the value of the *Brophy* claim into its bid for Primedia. It is reasonably conceivable that like the Merger Board, the bidders attributed no value to the *Brophy* claim and based their bids only on Primedia's operating business. Under the circumstances, it is reasonably conceivable that TPG received a "bargain basement price" for Primedia, representing its value without the *Brophy* claim, that TPG can benefit from owning Primedia "*without* bearing any material costs going forward as a result of [KKR's] prior wrongdoing," and that TPG is therefore "unlikely to pursue those claims." *Massey Energy*, 2011 WL 2176479, at *30 n. 199.

The plaintiffs have satisfied each of the three elements that *Parnes* and its progeny indicate must be met before a stockholder can maintain a direct claim challenging a merger based on the alleged failure to value a pending derivative claim. It is therefore equitable to allow the selling stockholders to challenge the Merger based on the failure to value the *Brophy* claim. *See Massey Energy*, 2011 WL 2176479, at *30 n. 199.

### 2. Whether The Challenge To The Fairness Of The Merger States A Claim

▮ The existence of standing to sue does not mean that the Class Complaint necessarily states a claim. *See Parnes*, 722 A.2d at 1246 ("Although we conclude that the Parnes complaint directly challenges the Bally merger, it does not necessarily follow that the complaint adequately

states a claim for relief."). The Class Complaint alleges that by approving the Merger at the price TPG offered, without taking any action to preserve the value of the *Brophy* claim, the Merger Board breached its fiduciary duties to Primedia's stockholders. "Any board negotiating the sale of a corporation should attempt to value and get full consideration for all of the corporation's material assets," including litigation assets. *Massey Energy*, 2011 WL 2176479, at *3; *accord Merritt*, 505 A.2d at 764. The degree to which a court will examine a board's success at this task depends on the standard of review.[7]

■ When a corporation with a controlling stockholder is sold to a third party, the entire fairness standard applies if the controlling stockholder receives a benefit not shared with the minority.[8] According to the Class Complaint, KKR received a special benefit in the form of a reduction in its exposure to the *Brophy* claim.

In *Massey Energy*, Chancellor Strine recognized that the transfer of a litigation asset could confer a special benefit on defendant fiduciaries, triggering the application of entire fairness. In his words,

> [T]here is some force to the plaintiffs' argument that the entire fairness standard applies because a majority of the Massey Board faced a substantial likelihood of liability on the basis of the Derivative Claims, the Merger could be perceived as lessening the chances for prosecution of those Claims, and thus the Merger could be seen as according to Massey directors a benefit that is not shared equally with other Massey stockholders.

*Massey Energy*, 2011 WL 2176479, at *18. The Chancellor declined to issue a preliminary injunction in that case because he could not conclude, after reviewing an extensive evidentiary record, that it was

7. *Compare Countrywide*, 2009 WL 846019, at *9 (applying business judgment rule to decision of majority-independent board regarding merger that would affect significant pending derivative claims where company was widely held) *and Porter v. Tex. Commerce Bancshares, Inc.*, 1989 WL 120358, at *5–6 (Del.Ch. Oct. 12, 1989) (applying business judgment rule to decision of majority-independent board to approve arms' length, third party merger that would affect standing to bring claims for mismanagement) *with Merritt*, 505 A.2d at 763, 765 (applying entire fairness test where merger would affect significant pending derivative claims against controlling stockholder) *and Kohls*, 765 A.2d at 1286 (declining to apply entire fairness test where merger would affect pending derivative claim against CEO and large stockholder, but where transaction was approved by special committee and conditioned on tender of 85% of shares).

8. *See In re Delphi Fin. Gp. S'holder Litig.*, 2012 WL 729232, at *12 n. 57 (Del.Ch. Mar. 6, 2012) ("For the purposes of this Motion only, I assume, as the Director Defendants did, ... that the entire fairness standard of review applies to the approval of the dispa-

rate Merger consideration."); *N.J. Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *9 (Del. Ch. Sept. 30, 2011, revised Oct. 6, 2011) (applying entire fairness standard where dominant director was "materially interested in the Merger because it provided him with desperately needed liquidity"); *In re John Q. Hammons Hotels Inc. S'holder Litig.*, 2009 WL 3165613, at *12 (Del. Ch. Oct. 2, 2009) (applying entire fairness in third party sale where controlling stockholder received differential consideration); *In re LNR Prop. Corp. S'holders Litig.*, 896 A.2d 169, 178 (Del.Ch.2005) (holding that entire fairness would likely apply to merger in which controlling stockholder sold to third party but received right to roll equity in transaction); *In re Tele–Commc'ns, Inc. S'holders Litig.*, 2005 WL 3642727, at *7 (Del.Ch. Dec. 21, 2005) ("Because a clear and significant benefit of nearly $300 million accrued primarily (over 84% of the total TCOMB premium proceeds) to such directors controlling such a large vote of the corporation, at the expense of another class of shareholders to whom was owed a fiduciary duty, then a standard of entire fairness applies." (footnote omitted)).

"probable that the Derivative Claims have a value that is material in relation to the value of Massey as an entity." *Id.* at *29. Nor could he rule out the possibility that Alpha, the acquirer of Massey, would pursue the claims in an effort to offset criminal sanctions, regulatory penalties, or awards of punitive damages. *Id.* at *24. The Chancellor therefore did not believe that the merger conferred a distinct benefit on the directors sufficient to render them interested in the merger and alter the standard of review. *See id.* at *16 ("I perceive no basis to infer that the Massey Board members were secretly harboring a fear for their net wealths because of the pending Derivative Claims, and viewed the transaction as a way to ease those fears.").

In the current case, at the motion to dismiss stage, it is reasonably conceivable that the Merger conferred a unique benefit on KKR. When KKR and the Merger Board elected to sell Primedia, they knew that the plaintiffs in the Derivative Action had pursued the claims tenaciously, including by obtaining the Dismissal Ruling, thoroughly litigating the SLC's dismissal motion, and then taking an appeal. There was no chance that the plaintiffs would simply abandon the field. The outlook would be radically different if KKR could sell Primedia to an entity that purchased the Company for its business operations alone and would be reluctant to antagonize a financial powerhouse like KKR. The prospects would be even better if Primedia ended up in the hands of a fellow private equity firm like TPG, whose principals have business ties to and personal relationships with the principals of KKR. *See* CC ¶¶ 65–68 (describing connections between TPG and KKR).

It is reasonably conceivable that because KKR could be confident that no acquirer would have any interest in pursuing the *Brophy* claim post-Merger, and because the individual defendants acceded to KKR's wishes without extracting any value for or taking steps to preserve the value of the *Brophy* claim, KKR received a unique benefit equal to the minority's share of any potential recovery in the Derivative Action. *See Merritt,* 505 A.2d at 766. With numbers ascribed to its components, the benefit works like this. Before the Merger, Primedia owned both its operating business (worth $316 million) and the right to a potential recovery on the *Brophy* claim (worth $190 million). Primedia's minority stockholders owned 42% of its outstanding stock, so their *pro rata* interest in Primedia had an alleged value of $213 million, consisting of one asset worth $133 million (42% of the operating business) and a second asset worth $80 million (42% of the potential recovery on the *Brophy* claim). KKR and its affiliates owned 58% of Primedia's outstanding stock, so their *pro rata* interest had an alleged value of $103 million, consisting of an asset worth $183 million (58% of the operating business), a liability worth $190 million (100% of the judgment in their capacity as defendants), and a related asset worth $110 million (58% of the judgment in their capacity as stockholders in Primedia). In the Merger, the minority stockholders received $133 million, and KKR and its affiliates received $183 million. The Merger effectively diverted the value of the minority stockholders' equitable interest in the *Brophy* claim—$80 million—from the minority to KKR. All figures are exclusive of prejudgment interest.

Because it is reasonably conceivable that KKR received a unique benefit in the Merger not shared with other stockholders, the standard of review for purposes of evaluating whether the complaint states a claim is entire fairness. The defendants did not implement any protective procedural devices that might alter the standard of review, such as a fully empowered com-

mittee, a majority-of-the-minority vote, or both. Entire fairness therefore applies, and I need not consider the plaintiffs' alternative argument that with two directors who were employees of KKR and six others with past ties to KKR, the Merger Board lacked a disinterested and independent majority. *See* Dismissal Ruling, 910 A.2d at 261 n. 45 (finding that the six non-employee members of the Merger Board had ties to KKR sufficient that they could not "be considered independent" for the purposes of a Rule 12(b)(6) motion).

Under the entire fairness standard, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price." *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del.1995) (internal quotation marks omitted). It is reasonably conceivable that the defendants will not be able to establish that the Merger was both the product of fair dealing and provided a fair price. In a controlling stockholder transaction, the proper "test of fairness" is whether "the minority stockholder shall receive the substantial equivalent in value of what he had before." [9] Before the Merger, Primedia's minority stockholders beneficially owned an asset with an alleged value of $213 million, consisting of $133 million for their share of Primedia's operating business and $80 million for their share of the *Brophy* claim. In the Merger, Primedia's minority stockholders received $133 million, $80 million less than the substantial equivalent of what they held before the Merger.

The defendants offer a number of arguments that amount to reasons why they believed subjectively that the *Brophy* claim had no value and that the Merger was fair. They say, for example, that they believed the Delaware Supreme Court would affirm this Court's dismissal of the *Brophy* claim, that they relied on the SLC's assessment of the merits of the claim, and that they relied on advice from counsel. But when entire fairness applies, "[n]ot even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness. Rather, the transaction itself must be objectively fair, independent of the board's beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del.Ch.2006). When a merger benefits a controlling stockholder by extinguishing a stockholder plaintiff's standing to pursue derivative claims, the defendants' subjective belief

> affords no ground upon which ... a reviewing court may dependably conclude that the termination of the derivative litigation ... was in the best interest of the corporation and was not simply in the interest of the directors and controlling shareholders who had been charged with wrongdoing. Without the guidance of a truly independent judgment, self-interested directors cannot with confidence know the right course in order to pursue it. In all events, the law, sensitive to the weakness of human nature and alert to the ever-present inclination to rationalize as right that which is merely beneficial, will accord scant weight to the subjec-

---

9. *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del.1952); *accord id.* at 110 (inquiring "whether ... the Mayflower minority stockholder will receive the substantial equivalent in value of the shares he held before the merger."); *see Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 940 (Del.1985) ("[T]he correct test of fairness is 'that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.' " (quoting *Sterling*, 93 A.2d at 114)). *See generally Weinberger v. UOP, Inc.*, 457 A.2d 701, 711–13 (Del.1983); *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 462–63 (Del.Ch. 2011).

tive judgment of an interested director concerning the fairness of transactions that benefit him.

*Merritt,* 505 A.2d at 765.

■■■■■ The subjective beliefs of the individual directors and the information on which they relied likely will have significant implications at a later phase of the case. "The entire fairness test is, at its core, an inquiry designed to assess whether a self-dealing transaction should be respected or set aside in equity. It has only a crude and potentially misleading relationship to the liability any particular fiduciary has for involvement in a self-dealing transaction." *Venhill Ltd. P'ship ex rel. Stallkamp,* 2008 WL 2270488, at *22 (Del. Ch. June 3, 2008). When a transaction involves self-dealing by one fiduciary but not by others who nevertheless approved the transaction, only the self-dealing fiduciary is "subject to damages liability for the gap between a fair price and the deal price without an inquiry into his subjective state of mind." *Id.* Self-dealing fiduciaries are liable because they breached their duty of loyalty if the transaction was unfair, regardless of whether they acted in subjective good faith. *See id.* But as to the other fiduciaries, even ones who might be deemed non-independent because of their status or relationships with the self-dealing fiduciaries, "the presence of the exculpatory charter provision would require an examination of their state of mind, in order to determine whether they breached their duty of loyalty by approving the transaction in bad faith ..., rather than in a good faith effort to benefit the corporation." *Id.* at *23. If those directors subjectively intended to act loyalty, then "their failure to procure a fair result does not expose them to liability." *Id.; see, e.g., In re Emerging Commc'ns, Inc., S'holders Litig.,* 2004 WL 1305745, at *38–44 (Del.Ch.2004) (analyzing exposure to

monetary judgment on a director-by-director basis in connection with self-interested going-private transaction that was held not to be entirely fair).

If the plaintiffs succeed in proving that the Merger was unfair, only KKR would be liable for self-dealing on that basis alone. The Court would need to conduct a director-by-director analysis of the members of the Merger Board to determine whether they acted with a culpable state of mind. The directors' subjective beliefs about the fairness of the Merger and the viability of the *Brophy* claim would be pertinent to that inquiry. The directors' reliance on counsel's advice and the SLC's determinations also would be relevant to their ability to invoke the protection from liability afforded by Section 141(e) of the Delaware General Corporation Law, which states:

A member of the board of directors ... shall ... be fully protected in relying in good faith ... upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees, or committees of the board of directors, or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

8 *Del. C.* § 141(e); *see Boyer v. Wilmington Materials, Inc.,* 754 A.2d 881, 910–11 (Del.Ch.1999) (evaluating whether directors could rely for purposes of Section 141(e) on counsel that represented interested parties). These arguments cannot be raised on a motion to dismiss to defeat a well-pled claim when the complaint supports the application of the entire fairness standard. *See, e.g., Valeant Pharm. Int'l v. Jerney,* 2007 WL 2813789, at *14 (Del. Ch. Mar. 1, 2007) (holding that Section

141(e) defense is not determinative of entire fairness); *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *3 n. 7 (Del.Ch. Dec. 19, 2002) (declining to consider Section 141(e) defense on motion to dismiss). The plaintiffs have therefore stated a claim that the Merger was not entirely fair.

### 3. Section 102(b)(7)

The individual defendants seek dismissal in light of Section 102(b)(7) of the Delaware General Corporation Law and the exculpatory provision in Primedia's charter. Although those director defendants who are independent and disinterested may ultimately be able to rely upon the charter provision, it is premature to dismiss the·claims against them on this basis. When the entire fairness standard of review applies, "the inherently interested nature of those transactions" renders the claims "inextricably intertwined with issues of loyalty." *Emerald P'rs v. Berlin*, 787 A.2d 85, 93 (Del.2001). The Class Complaint contains relatively insubstantial allegations of bad faith against the Outside Directors, but given the standard of review, I cannot dismiss them. *See LNR*, 896 A.2d at 178–79.

### 4. Collateral Estoppel

At several points in their papers, the defendants contend that the Delaware Supreme Court's affirmance of this Court's analysis under the first prong of *Zapata* operates as collateral estoppel as to matters discussed by the Delaware Supreme Court in its ruling. For collateral estoppel to apply, the issue previously determined must be identical to the issue in the current case. *See Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del.2000). A determination that the first *Zapata* prong had been satisfied is not a determination as to the merits of the Derivative Action. This is evident from the Delaware Supreme Court's opinion: "[T]he the Special Litigation Committee ... is under examination at this first-step stage of the proceedings, and not the merits of the plaintiff's cause of action." *Kahn*, 23 A.3d at 841 n. 52 (citing *Kaplan v. Wyatt*, 484 A.2d 501, 519 (Del.Ch.1984), *aff'd*, 499 A.2d 1184 (Del.1985)). The inquiry on the first prong of *Zapata* focuses on the SLC's good faith and the reasonableness of its investigation. *Id.* at 841. This is a different standard than whether the Class Complaint or the underlying Derivative Complaint states a claim under the *Central Mortgage* "reasonable conceivability" test. Collateral estoppel therefore does not apply, and the plaintiffs have stated a claim against the Merger.

### B. The Claim Challenging Section 6.5(d) of the Merger Agreement

Less vigorously, the Class Complaint advances a separate claim based on Section 6.5(d) of the Merger Agreement. This section only permitted the Merger Board to modify its recommendation in favor of the Merger during that brief window after execution of the Merger Agreement on May 15, 2011, but before KKR executed a written consent later that day. From that point on, the Merger Agreement prohibited the Merger Board from changing its recommendation, even if a material event occurred like the issuance of the Delaware Supreme Court's decision reversing the *Brophy* claim and making full disgorgement available. The plaintiffs contend that this provision impermissibly constrained the Merger Board's ability to update its merger recommendation. This theory does not state a claim.

Section 251(b) of the Delaware General Corporation Law provides that "[t]he board of directors of each corporation which desires to merge or consolidate shall adopt a resolution approving an agreement of merger or consolidation and declaring

its advisability." 8 *Del. C.* § 251(b). This single sentence imposes two separate statutory obligations. First, the board must "approv[e][the] agreement of merger." *Id.* Second, the board must "declar[e] its advisability." *Id.* The board's declaration of advisability is typically referred to as the board's merger recommendation, although Section 251 does not use that term. *See* 8 *Del. C.* § 251; Steven M. Haas, *Limiting Change of Merger Recommendations to "Intervening Events,"* 13 No. 8 M & A Law. 15, 20 n. 1 (Sept.2009).

■ Under Section 251(c), following board approval, the merger agreement must be submitted to stockholders "for the purpose of acting on the agreement." 8 *Del. C.* § 251(c). The board's recommendation is material information that must be communicated to the stockholders in connection with their vote on the merger. *See Smith v. Van Gorkom,* 488 A.2d 858, 888 (Del.1985) (explaining that a board cannot "delegate to the stockholders the unadvised decision as to whether to accept or reject the merger"); William T. Allen, *Understanding Fiduciary Outs: The What and the Why of an Anomalous Concept,* 55 Bus. Law. 653, 658 (2000) (noting that the disclosure of a current merger recommendation is encompassed within "the board's fiduciary obligation of candor"); Haas, *supra,* at 15 ("The board's merger recommendation is also part of its broader fiduciary duties to stockholders ... [which] include a duty of disclosure.").

■ A board has an ongoing obligation to review and update its recommendation. *See Frontier Oil Corp. v. Holly Corp.,* 2005 WL 1039027, at *28 (Del.Ch. Apr. 29, 2005) ("Revisiting the commitment to recommend the Merger was not merely something that the Merger Agreement allowed the [Target] Board to do; it was the duty of the [Target] Board to review the transaction to confirm that a favorable recom-

mendation would continue to be consistent with its fiduciary duties."). The duty includes "an obligation to use reasonable care in presenting a recommendation for stockholder action and in gathering and disseminating corporate information in connection with that recommendation." Lawrence A. Hamermesh, *Calling Off the Lynch Mob: The Corporate Director's Fiduciary Disclosure Duty,* 49 Vand. L.Rev. 1087, 1163 (1996).

"Delaware law requires that a board of directors give a meaningful, current recommendation to stockholders regarding the advisability of a merger including, if necessary, recommending against the merger as a result of subsequent events." R. Franklin Balotti & A. Gilchrist Sparks, III, *Deal–Protection Measures and the Merger Recommendation,* 96 Nw. U.L.Rev. 467, 476 (2002). This obligation flows from the bedrock principle that "when directors communicate publicly or directly with shareholders about corporate matters, the *sine qua non* of directors' fiduciary duty to shareholders is honesty." *Malone v. Brincat,* 722 A.2d 5, 10 (Del. 1998). The duty of loyalty, which mandates that directors act in stockholders' best interests, consequently "requires ensuring an informed stockholder vote." Haas, *supra,* at 16 (citing *In re Berkshire Realty Co., Inc.,* 2002 WL 31888345, at *4 (Del.Ch. Dec. 18, 2002) ("[I]f the board, in the exercise of its business judgment, determined that liquidation was not in the best interests of ... its stockholders, it could not have recommended a liquidation without violating its fiduciary duty to the stockholders.")). "The obligation to change a recommendation prior to a stockholder vote can be further viewed as a duty to update a prior material statement." *Id.* "A board may not suggest or imply that it is recommending the merger to the shareholders if in fact its members have

concluded privately that the deal is not now in the best interest of the shareholders." Allen, *supra*, at 658.

In light of these principles, "[t]he target board must have an ability to make a truthful and candid recommendation consistent with its fiduciary duties—and this duty will be applicable whether or not there is a superior offer." John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary–Out Forms: Part I*, 13 Insights: The Corp. & Sec. L. Advisor, No. 10, 2, 5 (Nov.1999) [hereinafter *Rubeophobe Part I* ]. A target board may not "tie its hands ... [and] agree to recommend the existing agreement even when, because of changed circumstances, it believes the existing agreement is not, at the time of its recommendation, in the stockholders' best interests." John F. Johnston, *A Rubeophobic Delaware Counsel Marks Up Fiduciary–Out Forms: Part II*, 14 Insights: The Corp. & Sec. L. Advisor, No. 2, 16, 19 (Feb.2000). It follows that "[t]he carve-out [in a merger agreement] from the target board's obligation to recommend the agreement to the target's stockholders raises issues that are fundamentally different from those raised by the no-shop and termination carve-outs because it implicates the duties of the target di-

rectors to communicate truthfully with its stockholders." *Id.* "[U]nlike in the no-shop and termination outs, fiduciary duty law cannot be overridden by the contract provisions." *Rubeophobe Part I* at 3.

■ The Class Complaint alleges that the language of Section 6.5(d) prevented the Merger Board from complying with its fiduciary duties to provide a current and candid merger recommendation. Section 6.5(d) states:

(d) *No Change in Recommendation or Alternative Acquisition Agreement.* Except as set forth in this Section 6.5(d), Section 6.5(e) [10] or Section 8.3(a),[11] the Company Board and each committee thereof shall not:

(i) withhold, withdraw, qualify or modify, or publicly propose to withdraw qualify or modify, in a manner adverse to [TPG], the Company Recommendation [12] (it being understood that the Company Board may take no position with respect to an Acquisition Proposal [13] until the close of business as of the tenth (10th) Business Day after the commencement of such Acquisition Proposal pursuant to Rule 14d–2 under the Exchange Act without such action being considered an adverse modification);

10. Section 6.5(e), entitled "Certain Permitted Disclosures," states: "Nothing contained in this Section 6.5 shall be deemed to prohibit the Company or the Company Board or any committee thereof from (i) complying with its disclosure obligations under U.S. federal or state law with regard to an Acquisition Proposal...."

11. Section 8.3(a) identifies the circumstances under which the Company can terminate the Merger Agreement.

12. Section 3.4 defines "Company Recommendation" as a resolution by the Company Board to "recommend that stockholders of the Company adopt this Agreement."

13. Section 6.5(c)(i) defines "Acquisition Proposal" as "any inquiry, proposal or offer from any person or group of persons other than [TPG] for (A) a merger, reorganization, consolidation, share exchange, business combination, recapitalization, liquidation, dissolution or similar transaction involving an acquisition of the Company (or any subsidiary or subsidiaries of the Company whose business constitutes 20% or more of the net revenues, net income or assets of the Company and its subsidiaries, taken as a whole) or (B) the acquisition in any manner, directly or indirectly, of over 20% of the equity securities or consolidated total assets of the Company and its subsidiaries, in each case other than the Merger."

(ii) approve or recommend, or publicly propose to approve or recommend, any Acquisition Proposal or any letter of intent or agreement in principle with respect to a Acquisition Proposal;

(iii) except as expressly permitted by Section 8.3(a), cause or permit the Company to enter into any acquisition agreement, merger agreement or similar definitive agreement (other than a confidentiality agreement referred to in Section 6.5(b)) (an *"Alternative Acquisition Agreement"*) relating to any Acquisition Proposal; or

(iv) agree or resolve to take, or publicly announce any intention to take, any of the actions set forth in clauses (i), through (iii) above.

Notwithstanding the provisions of this Section 6.5(d),

(I) at any time prior to obtaining the Company Requisite Vote, if the Company Board determines or any committee thereof believes in good faith, after consultation with outside counsel that failure to take any of the actions set forth in clauses (i) through (v) [14] of this Section 6.5(d) (any of the foregoing, a *"Change of Recommendation"*) ... could be inconsistent with its fiduciary duties under applicable law other than because the Company has a received a Superior Proposal,[15] the Company Board may take any of the actions set forth in

clauses (i), (ii) and (v) of this Section 6.5(d) and

(II) at any time prior to obtaining the Company Requisite Vote, if the Company Board determines, in good faith, after consultation with independent financial advisors and outside legal counsel, that (x) an Acquisition Proposal is a Superior Proposal and

(y) failure to take such action could be inconsistent with the directors' fiduciary duties under applicable law, the Company Board may, in response to such a Superior Proposal, take any of the actions set forth in clauses (i) through (v) of this Section 6.5(d) with respect a Superior Proposal;

provided that prior to taking any such actions permitted pursuant to this clause (II),

(w) the Company has given [TPG] at least two (2) Business Days' prior written notice of its intention to take such action (which notice shall include an unredacted copy of the Superior Proposal, an unredacted copy of the relevant proposed transaction agreements and an unredacted copy of any financing commitments relating thereto),

(x) the Company has negotiated, and has caused its representatives to negotiate, in good faith with [TPG] during such notice period, to the extent [TPG] wishes to negotiate, to enable [TPG] to propose revisions to the terms of this

---

**14.** This appears to be a typographical error. Section 6.5(d) does not have a subsection (v), but nevertheless refers repeatedly to the non-existent subsection.

**15.** Section 6.5(c)(ii) defines "Superior Proposal" as "any bona fide written Acquisition Proposal (with the percentages set forth in the definition of such term changed from 20% to 50%), that the Company Board has determined in its good faith judgment after consultation with the Company's outside legal counsel and independent financial advisors (A) is

reasonably likely to be consummated in accordance with its terms, taking into account all legal, financial and regulatory aspects of the proposal and the person making the proposal, and (B) if consummated, would result in a transaction more favorable to the Company's stockholders (solely in their capacity as such) from a financial point of view than the transaction contemplated by this Agreement (including any revisions to the terms of this Agreement proposed by [TPG] in response to such proposal or otherwise)."

Agreement, the Financing Commitments and the Guarantees such that it would cause such Superior Proposal to no longer constitute a Superior Proposal,

(y) following the end of such notice period, the Company Board shall have considered in good faith any proposed revisions to this Agreement, the Financing Commitments and the Guarantees proposed in writing by [TPG], and shall have determined that the Superior Proposal would continue to constitute a Superior Proposal if such revisions were to be given effect and

(z) in the event of any material change to the material terms of such Superior Proposal, the Company shall, in each case, have delivered to [TPG] an additional notice consistent with that described in clause (w) above and the notice period shall have recommenced, except that the notice period shall be at least one Business Day (unless the initial two (2) Business Day period has not concluded, in which case such notice period shall be at least one Business Day after such additional notice); and provided, further that the Company has complied in all material respects with its obligations under this Section 6.5.

Primedia, Inc., Definitive Information Statement (Form DEF 14–A) (June 20, 2011) at A–23 to –24. The plaintiffs accurately interpret this lengthy provision as only permitting the Merger Board to change its recommendation before obtaining the Company Requisite Vote. The Merger Agreement defines the term "Company Requisite Vote" as "adoption of this Agreement by the affirmative vote or written consent of holders of at least a majority of the outstanding Shares." *Id.* at A–7.

Under Section 6.5(d), the Merger Board lacked the contractual right to change its recommendation after KKR provided the Company Requisite Vote by delivering its written consent. If the Merger Board had a continuing duty to update its recommendation after this point, and if an event occurred that conceivably could have required the Merger Board to change its recommendation (like the Delaware Supreme Court's decision), and if the Merger Board failed to change its recommendation, then the plaintiffs would state a claim for breach of duty. The viability of that claim depends in the first instance on the point at which the obligation to update the merger recommendation ends.

Under Section 251(b), the board's obligation to declare the advisability of a merger and hence maintain a current merger recommendation relates to the statutory requirement of stockholder approval. The board's obligation to update its merger recommendation therefore should only last through the point at which stockholder approval is obtained. Chancellor Allen reached this conclusion implicitly in rejecting a claim that a proxy statement was materially misleading because it described the board's ability to modify its merger recommendation as terminating upon the stockholder vote. *See In re Mobile Commc'ns Corp.*, 1989 WL 997182 (Del.Ch. Apr. 3, 1989), *aff'd,* 608 A.2d 729 (Del.1992). Like the Merger Agreement here, the merger agreement in *Mobile Communications* only permitted the board to change its recommendation before the stockholder vote. Chancellor Allen held that the proxy statement accurately described the board's contractual ability to change its recommendation and noted that the board had not obtained a broader right to terminate the agreement even after stockholder approval, as authorized by Section 251(d). *Id.* at *2–3. If the target board had a supervening obligation to update its merger recommendation after

stockholder approval that conflicted with the contract provision, then the disclosure in the proxy statement would not have been accurate and Chancellor Allen would not have ruled as he did.

The plaintiffs have not offered an alternative point in time for the merger recommendation obligation to terminate. Based on the structure of Section 251 and Chancellor Allen's ruling in *Mobile Communications*, the board's obligation to maintain a current and candid merger recommendation terminates at the point of the stockholder vote.

 Unless the corporation's charter otherwise provides, stockholders in a Delaware corporation may take action by written consent in lieu of voting at a meeting. *See* 8 *Del. C.* § 228(a). Stockholders may act by written consent to approve a merger agreement. *See In re OPEN-LANE, Inc. S'holders Litig.*, 2011 WL 4599662, at *10 (Del.Ch. Sept. 30, 2011); *Optima Int'l of Miami, Inc. v. WCI Steel, Inc.*, C.A. No. 3833–VCL, at 136–38 (Del. Ch. June 27, 2008) (TRANSCRIPT). Once stockholder approval has been obtained, the board's obligation to declare the advisability of the merger and concomitant duty to update that recommendation ends. When KKR delivered the necessary stockholder vote by acting via written consent, the Merger Board's recommendation obligation terminated. Assuming that the issuance of the Delaware Supreme Court decision in theory could have required the Merger Board to revisit its merger recommendation, the Merger Board had no obligation to do so because Primedia's stockholders already had adopted the Merger Agreement through KKR's action by written consent.

The endpoint for the statutory obligation to maintain a current and candid merger recommendation highlights a distinction between that requirement and the fiducia-ry duty to disclose material information when seeking stockholder action. The "duty of disclosure is not an independent duty, but derives from the duties of care and loyalty." *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del.2009) (internal quotation marks omitted). It arises because of "the application in a specific context of the board's fiduciary duties...." *Malpiede v. Townson*, 780 A.2d 1075, 1086 (Del.2001). The duty "does not exist in a vacuum." *Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992). Its scope and requirements depend on context. Hamermesh, *supra*, at 1099.

"[T]he fiduciary duty of a Delaware director is unremitting." *Malone*, 722 A.2d at 10; *accord Quickturn Design Sys. Inc. v. Shapiro*, 721 A.2d 1281, 1292 (Del.1998); *Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989). "[D]irectors of Delaware corporations [have] a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Stroud*, 606 A.2d at 84. If a merger gives rise to appraisal rights, then the duty to disclose all material information applies, even if the transaction does not require stockholder approval or a controller has provided it. *See, e.g., Gilliland v. Motorola, Inc.*, 859 A.2d 80, 88–89 (Del.Ch.2004) (disclosure obligation in connection with back-end short form merger and appraisal election); *McMullin v. Beran*, 765 A.2d 910, 925–26 (Del.2000) (disclosure obligation in connection with two-step merger involving tender decision and appraisal election); *Skeen v. Jo–Ann Stores, Inc.*, 750 A.2d 1170, 1172–73 (Del.2000) (disclosure obligation in connection with appraisal election for short-form merger). "[T]here is no different standard [of disclosure] for appraisal decisions." *Skeen*, 750 A.2d at 1171.

The running of the time period for maintaining a current merger recommendation

did not mean that the Merger Board stopped owing fiduciary duties, including a duty of disclosure. It simply changed one aspect of the legal framework within which those duties operated. Apart from their merger recommendation argument, the plaintiffs do not contend that the Merger Board breached its duty to disclose all material information in connection with the Primedia stockholders' appraisal decision. Nor would such a claim survive a motion to dismiss. The Merger Board promptly disclosed the issuance of the Delaware Supreme Court's decision in a press release on June 24, 2011, and stated that the decision "did not alter the conclusion ... that it was not in the best interests of the Company to pursue the claims asserted in the derivative action." Primedia, Inc., Current Report (Form 8–K) (June 24, 2011).

The Class Complaint therefore does not state a claim as to Section 6.5 of the Merger Agreement. This aspect of the Class Complaint is dismissed.

## C. The Aiding and Abetting Claim

■■■ The Class Complaint asserts a claim for aiding and abetting against TPG and its acquisition vehicles. Under Delaware law, a claim for aiding and abetting breach of fiduciary duty has four elements: "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, ... (3) knowing participation in that breach by the defendants, and (4) damages proximately caused by the breach." *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal quotation marks omitted). The claim fails because the Class Complaint has not adequately pled how TPG knowingly participated in the breach of duty. TPG competed with other potential acquirers in a public sale process and emerged as the winner. The plaintiffs' theory does not rest on a conspiracy between KKR and TPG. It rather depends on the inference that none of the acquirers would pay rationally for the *Brophy* claim, and that KKR and the Merger Board knew that none of the acquirers would ever assert it. Nothing about the transaction suggests TPG's complicity in the alleged breach of duty by the Merger Board and KKR. The aiding and abetting claim against TPG and its affiliates is dismissed.

## III. CONCLUSION

The motion to dismiss is denied as to the claim for breach of fiduciary duty against KKR and the members of the Merger Board on the grounds that the Merger was not entirely fair in light of the *Brophy* claim. In all other respects, the motion is granted.